# UNITED STATES *v.* HUTCHESON ET AL.

No. 43.  Argued December 10, 1940.—Decided February 3, 1941.

220

*Assistant Attorney General Arnold,* with whom *Solicitor General Biddle* and *Messrs. Richard H. Demuth* and *Roscoe T. Steffen* were on the brief, for the United States.

222

224

*Mr. Charles H. Tuttle,* with whom *Messrs. Joseph O. Carson, Thomas E. Kerwin,* and *Joseph O. Carson, II,* were on the brief, for appellees.

226

Mr. Justice Frankfurter delivered the opinion of the Court.

Whether the use of conventional, peaceful activities by a union in controversy with a rival union over certain jobs is a violation of the Sherman Law, Act of July 2, 1890, 26 Stat. 209, as amended, 15 U. S. C. § 1, is the question. It is sharply presented in this case because it arises in a criminal prosecution. Concededly an injunction either at the suit of the Government or of the employer could not issue.

Summarizing the long indictment, these are the facts. Anheuser-Busch, Inc., operating a large plant in St. Louis, contracted with Borsari Tank Corporation for the erection of an additional facility. The Gaylord Container Corporation, a lessee of adjacent property from Anheuser-Busch, made a similar contract for a new building with the Stocker Company. Anheuser-Busch obtained the

materials for its brewing and other operations and sold its finished products largely through interstate shipments. The Gaylord Corporation was equally dependent on interstate commerce for marketing its goods, as were the construction companies for their building materials. Among the employees of Anheuser-Busch were members of the United Brotherhood of Carpenters and Joiners of America and of the International Association of Machinists. The conflicting claims of these two organizations, affiliated with the American Federation of Labor, in regard to the erection and dismantling of machinery had long been a source of controversy between them. Anheuser-Busch had had agreements with both organizations whereby the Machinists were given the disputed jobs and the Carpenters agreed to submit all disputes to arbitration. But in 1939 the president of the Carpenters, their general representative, and two officials of the Carpenters' local organization, the four men under indictment, stood on the claims of the Carpenters for the jobs. Rejection by the employer of the Carpenters' demand and the refusal of the latter to submit to arbitration were followed by a strike of the Carpenters, called by the defendants against Anheuser-Busch and the construction companies, a picketing of Anheuser-Busch and its tenant, and a request through circular letters and the official publication of the Carpenters that union members and their friends refrain from buying Anheuser-Busch beer.

These activities on behalf of the Carpenters formed the charge of the indictment as a criminal combination and conspiracy in violation of the Sherman Law. Demurrers denying that what was charged constituted a violation of the laws of the United States were sustained, 32 F. Supp. 600, and the case came here under the Criminal Appeals Act. Act of March 2, 1907, 34 Stat. 1246, 18 U. S. C. § 682; Judicial Code § 238, 28 U. S. C. § 345.

In order to determine whether an indictment charges an offense against the United States, designation by the pleader of the statute under which he purported to lay the charge is immaterial. He may have conceived the charge under one statute which would not sustain the indictment but it may nevertheless come within the terms of another statute. See *Williams* v. *United States,* 168 U. S. 382. On the other hand, an indictment may validly satisfy the statute under which the pleader proceeded, but other statutes not referred to by him may draw the sting of criminality from the allegations. Here we must consider not merely the Sherman Law but the related enactments which entered into the decision of the district court.

Section 1 of the Sherman Law on which the indictment rested is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." The controversies engendered by its application to trade union activities and the efforts to secure legislative relief from its consequences are familiar history. The Clayton Act of 1914 was the result. Act of October 15, 1914, 38 Stat. 730. "This statute was the fruit of unceasing agitation, which extended over more than twenty years and was designed to equalize before the law the position of workingmen and employer as industrial combatants." *Duplex Co.* v. *Deering,* 254 U. S. 443, 484. Section 20 of that Act, which is set out in the margin in full,[1] with-

[1] 38 Stat. 738, 29 U. S. C. § 52: "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the appli-

drew from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them—since the use of the injunction had been the major source of dissatisfaction—and also relieved such practices of all illegal taint by the catch-all provision, "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." The Clayton Act gave rise to new litigation and to renewed controversy in and out of Congress regarding the status of trade unions. By the generality of its terms the Sherman Law had necessarily compelled the courts to work out its meaning from case to case. It was widely believed that into the Clayton Act courts read the very beliefs which that Act was designed to remove. Specifically the courts restricted the scope of § 20 to trade union activities directed against an employer by his own employees. *Duplex Co.* v. *Deer-*

---

cation, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

*ing, supra.* Such a view it was urged, both by powerful judicial dissents and informed lay opinion, misconceived the area of economic conflict that had best be left to economic forces and the pressure of public opinion and not subjected to the judgment of courts. *Ibid.*, p. 485–486. Agitation again led to legislation and in 1932 Congress wrote the Norris-LaGuardia Act. Act of March 23, 1932, 47 Stat. 70, 29 U. S. C. §§ 101–115.

The Norris-LaGuardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the "public policy of the United States" in regard to the industrial conflict,[2] and by its light established that the allowable area of union activity was not to be restricted, as it had been in the *Duplex* case, to an immediate employer-employee relation. Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct.

---

[2] "Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Were, then, the acts charged against the defendants prohibited, or permitted, by these three interlacing statutes? If the facts laid in the indictment come within the conduct enumerated in § 20 of the Clayton Act they do not constitute a crime within the general terms of the Sherman Law because of the explicit command of that section that such conduct shall not be "considered or held to be violations of any law of the United States." So long as a union acts in its self-interest and does not combine with non-labor groups,[3] the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means. There is nothing remotely within the terms of § 20 that differentiates between trade union conduct directed against an employer because of a controversy arising in the relation between employer and employee, as such, and conduct similarly directed but ultimately due to an internecine struggle between two unions seeking the favor of the same employer. Such strife between competing unions has been an obdurate conflict in the evolution of so-called craft unionism and has undoubtedly been one of the potent forces in the modern development of industrial unions. These conflicts have intensified industrial tension but there is not the slightest warrant for saying that Congress has made § 20 inapplicable to trade union conduct resulting from them.

In so far as the Clayton Act is concerned, we must therefore dispose of this case as though we had before us precisely the same conduct on the part of the defendants in pressing claims against Anheuser-Busch for in-

[3] Cf. *United States* v. *Brims,* 272 U. S. 549, involving a conspiracy of mill work manufacturers, building contractors and union carpenters.

creased wages, or shorter hours, or other elements of what are called working conditions. The fact that what was done was done in a competition for jobs against the Machinists rather than against, let us say, a company union is a differentiation which Congress has not put into the federal legislation and which therefore we cannot write into it.

It is at once apparent that the acts with which the defendants are charged are the kind of acts protected by § 20 of the Clayton Act. The refusal of the Carpenters to work for Anheuser-Busch or on construction work being done for it and its adjoining tenant, and the peaceful attempt to get members of other unions similarly to refuse to work, are plainly within the free scope accorded to workers by § 20 for "terminating any relation of employment," or "ceasing to perform any work or labor," or "recommending, advising, or persuading others by peaceful means so to do." The picketing of Anheuser-Busch premises with signs to indicate that Anheuser-Busch was unfair to organized labor, a familiar practice in these situations, comes within the language "attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working." Finally, the recommendation to union members and their friends not to buy or use the product of Anheuser-Busch is explicitly covered by "ceasing to patronize . . . any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do."

Clearly, then, the facts here charged constitute lawful conduct under the Clayton Act unless the defendants cannot invoke that Act because outsiders to the immediate dispute also shared in the conduct. But we need not determine whether the conduct is legal within the restrictions which *Duplex Co.* v. *Deering* gave to the im-

munities of § 20 of the Clayton Act. Congress in the Norris-LaGuardia Act has expressed the public policy of the United States and defined its conception of a "labor dispute" in terms that no longer leave room for doubt. *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products,* 311 U. S. 91. This was done, as we recently said, in order to "obviate the results of the judicial construction" theretofore given the Clayton Act. *New Negro Alliance* v. *Sanitary Grocery Co.,* 303 U. S. 552, 562; see *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 507, n. 26. Such a dispute, § 13 (c) provides, "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." [4] And under § 13 (b) a person is "participating or interested in a labor dispute" if he "is engaged in the same industry, trade, craft, or occupation, in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation."

To be sure, Congress expressed this national policy and determined the bounds of a labor dispute in an act explicitly dealing with the further withdrawal of injunctions in labor controversies. But to argue, as it was urged before us, that the *Duplex* case still governs for purposes of a criminal prosecution is to say that that which on the equity side of the court is allowable conduct may in a criminal proceeding become the road to

---

[4] Three years later, in the National Labor Relations Act, Congress gave similar breadth to the definition of a labor dispute. Act of July 3, 1935, 49 Stat. 448, 449, 29 U. S. C. § 152 (9).

prison. It would be strange indeed that although neither the Government nor Anheuser-Busch could have sought an injunction against the acts here challenged, the elaborate efforts to permit such conduct failed to prevent criminal liability punishable with imprisonment and heavy fines. That is not the way to read the will of Congress, particularly when expressed by a statute which, as we have already indicated, is practically and historically one of a series of enactments touching one of the most sensitive national problems. Such legislation must not be read in a spirit of mutilating narrowness. On matters far less vital and far less interrelated we have had occasion to point out the importance of giving "hospitable scope" to Congressional purpose even when meticulous words are lacking. *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381, 391, and authorities there cited. The appropriate way to read legislation in a situation like the one before us, was indicated by Mr. Justice Holmes on circuit: "A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur in the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson* v. *United States* 163 F. 30, 32.

The relation of the Norris-LaGuardia Act to the Clayton Act is not that of a tightly drawn amendment to a technically phrased tax provision. The underlying aim

of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction. This was authoritatively stated by the House Committee on the Judiciary. "The purpose of the bill is to protect the rights of labor in the same manner the Congress intended when it enacted the Clayton Act, October 15, 1914 (38 Stat. L., 738), which act, by reason of its construction and application by the Federal courts, is ineffectual to accomplish the congressional intent." H. Rep. No. 669, 72d Congress, 1st Session, p. 3. The Norris-LaGuardia Act was a disapproval of *Duplex Printing Press Co.* v. *Deering, supra,* and *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37, as the authoritative interpretation of § 20 of the Clayton Act, for Congress now placed its own meaning upon that section. The Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act. In this light § 20 removes all such allowable conduct from the taint of being a "violation of any law of the United States," including the Sherman Law.

There is no profit in discussing those cases under the Clayton Act which were decided before the courts were furnished the light shed by the Norris-LaGuardia Act on the nature of the industrial conflict. And since the facts in the indictment are made lawful by the Clayton Act in so far as "any law of the United States" is concerned, it would be idle to consider the Sherman Law apart from the Clayton Act as interpreted by Congress. Cf. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469. It was precisely in order to minimize the difficulties to which the general language of the Sherman Law in its application to workers had given rise, that Congress cut through all the tangled verbalisms and enumerated concretely the types

of activities which had become familiar incidents of union procedure.

*Affirmed.*

MR. JUSTICE MURPHY took no part in the disposition of this case.

MR. JUSTICE STONE, concurring.

As I think it clear that the indictment fails to charge an offense under the Sherman Act, as it has been interpreted and applied by this Court, I find no occasion to consider the impact of the Norris-LaGuardia Act on the definition of participants in a labor dispute in the Clayton Act, as construed by this Court in *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443—an application of the Norris-LaGuardia Act which is not free from doubt and which some of my brethren sharply challenge.

The indictment is for a conspiracy to promote by peaceful means a local "jurisdictional" strike in St. Louis, Missouri. Its aim is to determine whether the United Brotherhood of Carpenters or the International Association of Machinists, both labor organizations affiliated with the American' Federation of Labor, shall be permitted to install certain machinery on the premises of Anheuser-Busch, Inc. in St. Louis. It appears that Anheuser-Busch brews beer and manufactures other products which it ships to points outside the state. It also uses supplies and building materials which are shipped to it from points outside the state. Borsari Tank Corporation is about to construct for Anheuser-Busch upon its premises a building for its use in brewing beer. L. O. Stocker Company has contracted and intends to construct an office building upon land of Anheuser-Busch adjacent to its brewery and leased by it to the Gaylord Container Corporation, a manufacturer of paper and cardboard containers which it ships in interstate commerce. It is al-

leged that both Borsari and Stocker will require and use in the construction of the buildings, materials to be shipped from points outside the state to the building sites on or adjacent to the Anheuser-Busch premises.

The indictment charges that pursuant to the conspiracy to enforce the jurisdictional demands appellees, who are officers or representatives of the Brotherhood, called a strike of its members, some seventy-eight in number, in the employ of Anheuser-Busch, attempted to call sympathy strikes by members of other unions in its employ and caused the premises of Anheuser-Busch and the adjacent premises leased to Gaylord to be picketed by persons "bearing umbrellas and charging Anheuser-Busch, Inc., to be unfair to organized labor; with the intent to shut down the brewery and manufacturing plant of Anheuser-Busch, Inc., to hinder and prevent the passage of persons and property to and from said premises and thus to restrain and stop the commerce of Anheuser-Busch" in the beer and other products manufactured by it, and in the supplies and materials procured by it extrastate, and "to restrain the commerce" of Gaylord. It is alleged that pursuant to the conspiracy, defendants "refused to permit members of the United Brotherhood . . . to be employed and prevented such members from being employed by Borsari . . . with the intent and effect of preventing construction of the building about to be built by Borsari . . . and thus of restraining the commerce of Anheuser-Busch in beer . . . and also with the knowledge and willful disregard of the consequent restraint and stoppage of commerce in the materials intended to be used by Borsari." Like allegations are made with respect to Stocker with the added charge that the acts alleged were with intent to prevent performance of Stocker's contract with Gaylord "with willful disregard of the consequent restraint of the commerce of Gaylord."

There is the further allegation that pursuant to the conspiracy defendants and their co-conspirators have instigated and brought about a "boycott of beer brewed by Anheuser-Busch . . . and of dealers in said beer throughout the United States," by distributing to members of labor organizations and to the public at large in many states and by published notices circulated interstate "denouncing Anheuser-Busch, Inc. as unfair to organized labor and calling upon all union members and friends of organized labor to refrain from purchasing and drinking said beer."

We are concerned with the alleged activities of defendants, actual or intended, only so far as they have an effect on commerce prohibited by the Sherman Act as it has been amended or restricted in its operation by the Clayton Act. The legality of the alleged restraint under the Sherman Act is not affected by characterizing the strike, as this indictment does, as "jurisdictional" or as not within the "legitimate object of a labor union." The restraints charged are of two types: One is that resulting to the commerce of Anheuser-Busch, Borsari, Stocker and Gaylord from the peaceful picketing of the Anheuser-Busch premises, a part of which is leased to Gaylord, and the refusal of the Brotherhood to permit its members to work, and its prevention of its members from working (by what means other than picketing does not appear) for Borsari and Stocker. The other is that resulting from the requests addressed to the public to refrain from purchasing Anheuser-Busch beer.

It is plain that the first type of restraint is only that which is incidental to the conduct of a local strike and which results from closing the plant of a manufacturer or builder who ships his product in interstate commerce, or who procures his supplies from points outside the state. Such restraints, incident to such a strike, upon the interstate transportation of the products or supplies have

been repeatedly held by this Court, without a dissenting voice, not to be within the reach of the Sherman Anti-Trust Act. There is here no allegation in the case of any of the employers of any interference, actual or intended, by strikers with goods moving or about to be shipped in interstate commerce such as was last term so sharply presented and held not to be a violation of the Sherman Act in *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469.

With respect to Borsari and Stocker the indictment does no more than charge a local strike to enforce the jurisdictional demands upon Anheuser-Busch by the refusal of union members to work in the construction of buildings for Anheuser-Busch or upon its land, the work upon which, so far as appears, has not even begun. The restraint alleged is only that resulting from the "disregard" by the strikers of the stoppage of the movement interstate of the building materials and the manufactured products of Gaylord consequent upon their refusal to construct the buildings. Precisely as in *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103, where a local building strike with like consequences was held not to violate the Sherman law, there is wanting here any fact to show that the conspiracy was directed at the use of any particular building material in the states of origin and destination or its transportation between them "with the design of narrowing or suppressing the interstate market," each of which were thought to be crucial in *Bedford Cut Stone Co.* v. *Stone Cutters' Assn.,* 274 U. S. 37, 46–47. See *Apex Hosiery Co.* v. *Leader, supra,* 506.

As to the commerce of Anheuser-Busch and Gaylord, the indictment at most shows a conspiracy to picket peacefully their premises and publicly to charge the former with being unfair to organized labor, all with the intent to shut down the plant of Anheuser-Busch

and to hinder and prevent the passage of persons and property to and from the premises and thus to restrain the commerce of Anheuser-Busch and Gaylord. There is also the allegation already noted that the refusal to work for Stocker will restrain the commerce of Gaylord, presumably because he will manufacture and ship less of his product if the proposed building is not completed.

It is a novel proposition that allegations of local peaceful picketing of a manufacturing plant to enforce union demands concerning terms of employment accompanied by announcements that the employer is unfair to organized labor is a violation of the Sherman Act whatever effect on interstate commerce may be intended to follow from the acts done. They, like the allegations here, show only such effect upon interstate commerce as may be inferred from the acts alleged and in any event such restraint as there may be is not shown to be more than that which is incidental to every strike causing a shutdown of a manufacturing plant whose product moves in interstate commerce or stopping building operations where the builder is using materials shipped to him in interstate commerce. If the counts of the indictment which we are now considering make out an offense, then every local strike aimed at closing a shop whose products or supplies move in interstate commerce is, without more, a violation of the Sherman Act. They present a weaker case than those unanimously held by this Court not to involve violation of the Sherman Act in *United Mine Workers* v. *Coronado Coal Co.* (First Coronado Case), 259 U. S. 344; *United Leather Workers* v. *Herkert & Meisel Co.,* 265 U. S. 457; *Levering & Garrigues Co.* v. *Morrin, supra,* and see *Coronado Coal Co.* v. *United Mine Workers* (Second Coronado Case), 268 U. S. 295, 310. In any case there is no allegation in the indictment that the restraint did or could operate to suppress competition

in the market of any product and so dismissal of these counts is required by our decision in *Apex Hosiery Co. v. Leader, supra.*

The second and only other type of restraint upon interstate commerce charged is the so-called "boycott" alleged to be by the publication of notices charging Anheuser-Busch with being unfair to labor and requesting members of the Union and the public not to purchase or use the Anheuser-Busch product. Were it necessary to a decision I should have thought that, since the strike against Anheuser-Busch was by its employees and there is no intimation that there is any strike against the distributors of the beer, the strike was a labor dispute between employer and employees within the labor provisions of the Clayton Act as they were construed in *Duplex Printing Press Co. v. Deering, supra.* In that case § 20 of the Act, as the opinion of the Court points out, makes lawful the action of any person* "ceasing to patronize . . . any party to such dispute" or "recommending, advising, or persuading others by peaceful and lawful means so to do."

Be that as it may, it is a sufficient answer to the asserted violation of the Sherman Act by the publication of such notices and requests, to point out that the strike was by employees of Anheuser-Busch; that there was no boycott of or strike against any purchaser of Anheuser-Busch beer by any concerted action or refusal to patronize him by the purchase of beer or other products supplied by him such as was condemned in *Loewe v. Lawlor,* 208 U. S. 274, 300–307; cf. *Apex Hosiery Co. v. Leader,*

---

*Appellees, being national and local officers of the Brotherhood and representing the employees in the labor dispute with their employer, are "proximately and substantially concerned" as parties to an actual dispute and are, therefore, entitled to the benefits of the Clayton Act. See *Duplex Printing Press Co. v. Deering, supra,* 470, 471.

*supra,* 505; and finally that the publication, unaccompanied by violence, of a notice that the employer is unfair to organized labor and requesting the public not to patronize him is an exercise of the right of free speech guaranteed by the First Amendment which cannot be made unlawful by act of Congress. See *Thornhill* v. *Alabama,* 310 U. S. 88.*

I can only conclude that, upon principles hitherto recognized and established by the decisions of this Court, the indictment charges no violation of the Sherman Act.

MR. JUSTICE ROBERTS, dissenting.

I am of opinion that the judgment should be reversed. The indictment adequately charges a conspiracy to restrain trade and commerce with the specific purpose of preventing Anheuser-Busch from receiving in interstate commerce commodities and materials intended for use in its plant; of preventing the Borsari Corporation from obtaining materials in interstate commerce for use in performing a contract for Anheuser-Busch, and of preventing the Stocker Company from. receiving materials in like manner for the construction of a building for the Gaylord Corporation. The indictment further charges that the conspiracy was to restrain interstate commerce flowing from Missouri into other states of products of Anheuser-Busch and generally to restrain the interstate trade and commerce of the three corporations named.[1]

Without detailing the allegations of the indictment, it is sufficient to say that they undeniably charge a secondary boycott, affecting interstate commerce.

This court, and many state tribunals, over a long period of years, have held such a secondary boycott illegal. In 1908 this court held such a secondary boycott, instigated to enforce the demands of a labor union against

---

[1] *C. E. Stevens Co.* v. *Foster & Kleiser Co.,* 311 U. S. 255.

an employer, was a violation of the Sherman Act and could be restrained at the suit of the employer.[2] It is matter of history that labor unions insisted they were not within the purview of the Sherman Act but this court held to the contrary. As a result of continual agitation the Clayton Act was adopted. That Act, as amended, became effective October 15, 1914.[3] Subsequently suits in equity were brought to restrain secondary boycotts similar to those involved in earlier cases. The contention was made that the Clayton Act exempted labor organizations from such suits. That contention was not sustained.[4] Upon the fullest consideration, this court reached the conclusion that the provisions of § 20 of the Clayton Act governed not the substantive rights of persons and organizations but merely regulated the practice according to which, and the conditions under which, equitable relief might be granted in suits of this character. Section 6 has no bearing on the offense charged in this case.

This court also unanimously held that a conspiracy such as is charged in the instant case renders the conspirators liable to criminal prosecution by the United States under the anti-trust acts.[5]

It is common knowledge that the agitation for complete exemption of labor unions from the provisions of the anti-trust laws persisted. Instead of granting the complete exemption desired, Congress adopted, March 23, 1932, the Norris-LaGuardia Act.[6] The title and the contents of that Act, as well as its legislative history,[7] dem-

---

[2] *Loewe* v. *Lawlor*, 208 U. S. 274.

[3] c. 323, 38 Stat. 730.

[4] *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443; *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.*, 274 U. S. 37.

[5] *United States* v. *Brims*, 272 U. S. 549.

[6] c. 90, 47 Stat. 70; 29 U. S. C. §§ 101–115.

[7] S. Rep. No. 163, 72d Cong., 1st Sess., pp. 7–8; H. Rep. No. 669, 72d Cong., 1st Sess., pp. 2–3; 75 Cong. Rec. 5464, 5467.

onstrate beyond question that its purpose was to define and to limit the jurisdiction of federal courts sitting in equity. The Act broadens the scope of labor disputes as theretofore understood, that is, disputes between an employer and his employes with respect to wages, hours, and working conditions, and provides that before a federal court can enter an injunction to restrain illegal acts certain preliminary findings, based on evidence, must be made. The Act further deprives the courts of the right to issue an injunction against the doing of certain acts by labor organizations or their members. It is unnecessary to detail the acts as to which the jurisdiction of a court of equity is abolished. It is sufficient to say, what a reading of the Act makes letter clear, that the jurisdiction of actions for damages authorized by the Sherman Act, and of the criminal offenses denounced by that Act, are not touched by the Norris-LaGuardia Act.

By a process of construction never, as I think, heretofore indulged by this court, it is now found that, because Congress forbade the issuing of injunctions to restrain certain conduct, it intended to repeal the provisions of the Sherman Act authorizing actions at law and criminal prosecutions for the commission of torts and crimes defined by the anti-trust laws. The doctrine now announced seems to be that an indication of a change of policy in an Act as respects one specific item in a general field of the law, covered by an earlier Act, justifies this court in spelling out an implied repeal of the whole of the earlier statute as applied to conduct of the sort here involved. I venture to say that no court has ever undertaken so radically to legislate where Congress has refused so to do.[8]

The construction of the act now adopted is the more clearly inadmissible when we remember that the scope

---

[8] The rule always heretofore followed in respect of implied repeal was recently expounded in an analogous situation in *United States* v. *Borden Co.*, 308 U. S. 188, 198.

of proposed amendments and repeals of the anti-trust laws in respect of labor organizations has been the subject of constant controversy and consideration in Congress. In the light of this history, to attribute to Congress an intent to repeal legislation which has had a definite and well understood scope and effect for decades past, by resurrecting a rejected construction of the Clayton Act and extending a policy strictly limited by the Congress itself in the Norris-LaGuardia Act, seems to me a usurpation by the courts of the function of the Congress not only novel but fraught, as well, with the most serious dangers to our constitutional system of division of powers.

The CHIEF JUSTICE joins in this opinion.