HUNT et al. v. BROTHERHOOD OF TRANSPORTATION WORKERS, LOCAL 107, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN AND HELPERS OF AMERICA et al.

No. 1011.

District Court, E. D. Pennsylvania.

Oct. 30, 1942.

572

Hirsh W. Stalberg and Peter P. Zion, both of Philadelphia, Pa., for plaintiffs.

William A. Gray, of Philadelphia, Pa., for defendants.

KALODNER, District Judge.

The issues having come to trial on Complaint and Answer, and having heard the testimony of witnesses and the argument of counsel, I make the following

## Findings of Fact.

1. The plaintiffs are copartners trading under the name of Hunt's Motor Freight and Food Products Transport, with their principal place of business at Philadelphia, Pennsylvania.

2. For a long period of time prior to the filing of this Complaint, the plaintiffs were engaged in the business of hauling produce and foodstuffs.

3. For a period of about fourteen years prior to February 4, 1939, practically the sole business of the plaintiffs was to operate under contracts, both written and oral, with the Great Atlantic & Pacific Tea Company (hereinafter referred. to as A & P), by the terms of which plaintiffs hauled and transported merchandise for the A & P.

4. From eighty to eighty-five per cent of the operations of plaintiffs described in Finding No. 3 were interstate from and to Philadelphia.

5. The defendant, Brotherhood of Transportation Workers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America (hereinafter referred to as the Union) is an unincorporated association of drivers and helpers engaged in "over the road hauling" and is affiliated with the American Federation of Labor. It is affiliated with numerous locals and subsidiary unions situated throughout the United States, each of which represents a separate branch or class of employees engaged in and about the loading and hauling of produce by trucks. Its main office is located at 105 Spring Garden Street, Philadelphia, Pennsylvania.

6. Sometime in 1937 the Union called a strike of the truckers and haulers of the A & P in Philadelphia for the purpose of enforcing a "closed shop".

7. The plaintiffs attempted to operate during the strike, and in July of 1937 refused the offer of the Union to negotiate.

8. The strike was attended with great violence and on September 4, 1937, one of the men connected with the Union was shot and killed at or near the Union headquarters.

9. One of the plaintiffs, Edward A. Hunt, was tried for the homicide described in Finding No. 8 and was acquitted.

10. On December 13, 1938, A & P entered into a "closed shop" agreement with the Union whereby A & P recognized the

Union as the bargaining agent for its employees, as a result of which the various contract haulers who were similarly situated as the plaintiffs with the said A & P recognized the defendant Union as the bargaining agent for their employees.

11. As a result of the said agreement between the said A & P and the defendant Union, all employees of the various contract haulers situated as were the plaintiffs with the said A & P were notified that they were required to join and become members of the defendant Union.

12. At the time of the making of the "closed shop" agreement, A & P had been employing the services of some twenty-five haulers (including plaintiffs) who were using about forty-eight trucks. The plaintiffs had eight trucks.

13. All the haulers of A & P except plaintiffs joined the Union or made "closed shop" agreements with it.

14. Plaintiffs (after the "closed shop" agreement was made with A & P and the Union) attempted to make an agreement with the Union. The Union refused to negotiate, and still refuses to do so.

15. The employees of the plaintiffs have attempted to join the Union, but were refused admission as long as they were employees of the plaintiffs.

16. On February 4, 1939, A & P at the instigation of the Union cancelled its contract with the plaintiffs as of March 10, 1939, on the ground that plaintiffs were non-union. The plaintiffs' services had otherwise been satisfactory.

17. From about November 6, 1939, to February 12, 1940, plaintiffs did interstate hauling for Sterling Supply Company of Philadelphia, but were compelled to desist under the same circumstances as accompanied the loss of the A & P contract.

18. The elimination of the plaintiffs' services did not in any manner affect the interstate operations of A & P or the Sterling Supply Company.

19. The business of plaintiffs has been destroyed by reason of the Union's refusal to negotiate with plaintiffs and the Union's unwillingness to admit plaintiffs and their employees into the Union.

### Discussion.

This action is under the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C.A. § 1, et seq., as amended by the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 15. The plaintiffs petition:

(1) that the Union be enjoined from refusing plaintiffs' employees admission to the Union;

(2) from interfering with plaintiffs' business;

(3) from boycotting plaintiffs and others who wish to deal with plaintiffs; and

(4) that the defendants be required to pay plaintiffs three-fold damages, together with costs, etc.

Defendants contend:

(1) that the Sherman Act is inapplicable;

(2) that this is a labor dispute and that plaintiffs have failed to comply with the provisions of the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq.; and

(3) that the Union has been justified in its conduct toward the plaintiffs and has the right to confer or deny membership as it sees fit.

■ The latter two contentions of the defendants raise some very interesting questions, but it is unnecessary to consider them, because I have come to the conclusion that under the decision of the United States Supreme Court in Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and the cases which follow it, that there has been no violation of the Sherman Act.

Section 1 of the Sherman Act, 15 U.S.C.A. § 1, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *."

In his opinion in the Apex Hosiery Co. case, from which I must generously quote, Justice (now Chief Justice) Stone points out, at pages 490, 491, 492, 493 of 310 U.S., at page 990 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044:

"* * * The legislative history of the Sherman Act as well as the decisions of this Court interpreting it, show that it was not aimed at policing interstate transportation or movement of goods and property. The legislative history and the voluminous literature which was generated in the course of the enactment and during fifty years of litigation of the Sherman Act give no hint that such was its purpose. * * * It was another and quite a different evil at which the Sherman Act was aimed. It was enacted in the era of 'trusts' and of 'combinations' of businesses and of

capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern.

\* \* \* \* \* \*

"For that reason the phrase 'restraint of trade' which, as will presently appear, had a well-understood meaning at common law, was made the means of defining the activities prohibited. [pages 494, 495 of 310 U.S., page 990 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044.]

\* \* \* \* \*

"The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman law. They were contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market. Such contracts were deemed illegal and were unenforcible at common law. But the resulting restraints of trade were not penalized and gave rise to no actionable wrong. Certain classes of restraints were not outlawed when deemed reasonable, usually because they served to preserve or protect legitimate interests, previously existing, of one or more parties to the contract.

"In seeking more effective protection of the public from the growing evils of restraints on the competitive system effected by the concentrated commercial power of 'trusts' and 'combinations' at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states. They extended the condemnation of the statute to restraints effected by any combination in the form of trust or otherwise, or conspiracy, as well as by contract or agreement, having those effects on the competitive system and on purchasers and consumers of goods or services which were characteristic of restraints deemed illegal at common law, and they gave both private and public remedies for the injuries flowing from such restraints. [pages 497, 498

of 310 U.S., page 994 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044.]

\* \* \* \* \*

"Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition." Pages 500, 501 of 310 U.S., page 996 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044. (Emphasis supplied.)

■ Applying the principles enunciated in the Apex Hosiery Co., case, I cannot see how the plaintiffs meet them. Assuming that there was a restraint on interstate commerce, the conduct of the defendants is not "shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."

Indeed, whatever evidence exists is quite to the contrary—the operations of A & P and the Sterling Supply Company were not affected by the elimination of the plaintiffs and there was no evidence that the public was in any way affected.

The Apex Hosiery Co. case is followed by United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 and United States v. Gold, 2 Cir., 115 F.2d 236. In United States v. Local 807, etc., 2 Cir., 118 F.2d 684, the United States Circuit Court of Appeals held that the Sherman Act was inapplicable.

Plaintiffs attempt to distinguish the above cited cases on the ground that they all involve labor disputes, and that here such is not involved because the labor dispute had already come to an end when the alleged offenses were committed. Assuming that to be the case, I fail to see how that distinction makes any difference. The Apex Hosiery Co. case makes no such distinction. In fact, Mr. Chief Justice Stone says (page 495 of 310 U.S., page 993 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044):

"A second significant circumstance is that this Court has never applied the Sherman Act in any case, whether or not involving labor organizations or activities unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of

*goods or services * * *."* (Emphasis supplied.)

Apparently plaintiffs have misconstrued the statement (page 500 of 310 U.S., page 996 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, supra): "Labor cases apart, which will presently be discussed, *this Court has not departed from the conception of the Sherman Act as affording a remedy, public and private, for the public wrongs which flow from restraints of trade in the common law sense of restriction or suppression of commercial competition."* (Emphasis supplied.)

The reason the Supreme Court makes this remark is that labor combinations might have a tendency to increase consumer prices, etc., and that the Sherman Act could be and was construed to cover them; the Clayton Act was enacted to clarify or remedy the situation for, as the Court says (pages 502, 503 of 310 U.S., page 997 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044):

"A combination of employees necessarily restrains competition among themselves in the sale of their services to the employer; yet such a combination was not considered an illegal restraint of trade at common law when the Sherman Act was adopted, either because it was not thought to be unreasonable or because it was not deemed a 'restraint of trade.' Since the enactment of the declaration in § 6 of the Clayton Act [15 U.S.C.A. § 17] that 'the labor of a human being is not a commodity or article of commerce * * * nor shall such (labor) organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws', it would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act."

Plaintiffs further attempt to distinguish the instant case on the ground that no legitimate labor objective is being sought by the Union's acts, and hence the interference with interstate commerce is direct and fundamental as distinguished from incidental. Again, assuming this to be so, there is no such distinction made by the Apex Hosiery Co. case, nor do the principles enunciated lend themselves to such distinction. In United States v. Hutcheson, supra, the Court said (page 232 of 312 U.S., page 466 of 61 S.Ct., 85 L.Ed. 788):

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

Of course, I am not passing here upon the question as to whether the plaintiffs can pursue other remedies. In this connection the following quotation from Swartz v. Forward Association, D.C., 41 F. Supp. 294, 296, is particularly appropriate. In that case the plaintiff alleged that the defendants conspired to destroy his interstate business by a boycott. The court said:

"Reading the bill as a whole, there are no facts alleged which would bring the activities of the defendants within the prohibitions of the antitrust laws. The injury complained of is a private wrong which we assume is remedial in some other court."

■ In the instant case there is no doubt that the plaintiffs have suffered a private injury. It is just as clear that they have failed to establish that there was prejudice to the public interest by undue restraint of competition or undue obstruction of the course of trade. As was stated in Appalachian Coals v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 474, 77 L.Ed. 825, 829:

"There is no question as to the test to be applied in determining the legality of the defendants' conduct. The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor."

For the reasons stated I have come to the conclusion that the Complaint must be dismissed.

Accordingly, I state the following

Conclusions of Law.

1. The acts complained of do not constitute a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., as amended by the Clayton Act, 15 U.S.C.A. § 12 et seq.

2. The plaintiffs' complaint must be dismissed.