EASTERN COAL CORPORATION,
Plaintiff-Appellee,

v.

DISABLED MINERS ASSOCIATION OF
SOUTHERN WEST VIRGINIA
et al., Defendants-Appellants.

FEDS CREEK COAL COMPANY, Inc.,
Plaintiff-Appellee,

v.

DISABLED MINERS ASSOCIATION OF
SOUTHERN WEST VIRGINIA
et al., Defendants-Appellants.

KENTLAND–ELKHORN COAL CORPO-
RATION, Plaintiff-Appellee,

v.

DISABLED MINERS ASSOCIATION OF
SOUTHERN WEST VIRGINIA
et al., Defendants-Appellants.

KENTUCKY CARBON CORPORATION,
Plaintiff-Appellee,

v.

DISABLED MINERS ASSOCIATION OF
SOUTHERN WEST VIRGINIA
et al., Plaintiff-Appellee.

Nos. 20800–20803.

United States Court of Appeals,
Sixth Circuit.

Oct. 14, 1971.

Joseph F. Flynn, Heidrick, Ky., for appellants.

David D. Johnson, Charleston, W. Va., and John M. Stephens, Pikeville, Ky., for appellees; Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., William J. Baird, Baird & Hays, Harry C. Campbell, Donald Combs, Stephens, Combs & Page, Pikeville, Ky., on the brief.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PECK, Circuit Judge.

This action is an appeal from the granting of a preliminary injunction by the District Court for the Eastern District of Kentucky against the appellant Disabled Miners Association of Southern West Virginia and certain named individuals (hereinafter "Disabled Miners") to prevent them from picketing at the entrances to the mines of the plaintiff coal mine operators (hereinafter "Mine Operators"). The picketing began on July 12, 1970, at the plaintiffs' mines in

Pike County, Kentucky, and continued sporadically for the next two weeks, causing several of the mines to operate at reduced capacity or even to shut down completely. The picketing was carried out by the Disabled Miners because of their dissatisfaction with the policies and administration of the United Mine Workers Welfare and Retirement Fund, particularly with regard to the benefits received by them under that fund.

The four cases herein were consolidated for disposition in the District Court, and, on August 6, 1970, a hearing was held on the plaintiffs' motion for a preliminary injunction. Following the receipt of evidence concerning the cause and nature of the dispute and the damages suffered by the Mine Operators as a result of the picketing, the District Court ruled that the defendants were engaged in an illegal combination and conspiracy to shut down a major portion of the coal production in the United States, that no "labor dispute" was involved, and that unless the picketing was enjoined the plaintiffs would be subjected to irreparable harm for which they have no adequate remedy at law. The Court found that the alleged combination and conspiracy was carried on to restrain the flow and production of coal in interstate commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that the Norris-LaGuardia Act, 29 U.S. C. § 101 et seq., does not prohibit the injunction because no "labor dispute" was involved. The Court further concluded that the picketing is not protected by the First Amendment of the Constitution because the activity was being carried on for an illegal purpose, that purpose being the violation of the anti-trust laws.

The controversy which is the concern of the picketing Disabled Miners centers about their contention that the Welfare and Retirement Fund was being unfairly administered as to them. The fund is managed by three trustees who consist of a representative of the Mine Operators, a representative of the United Mine Workers of America, and a third

mutually acceptable representative. The fund was created by the terms of the National Bituminous Coal Wage Agreement of 1950, and each Mine Operator signatory to the agreement pays a royalty of 40 cents a ton on the coal from his mine.

Prior to the picketing, the Disabled Miners had made public their discontent with the handling of the fund and had expressed a desire to meet with the trustees to discuss their various objections, dealing mostly with the amount of benefits being paid to the Disabled Miners, their widows and orphans. The evidence in the District Court established that the dissatisfaction of the Disabled Miners was centered upon the representative union, the United Mine Workers of America and its president, Tony Boyle. They desired to be heard by Mr. Boyle, who, as president of the union was also the union's representative as a trustee of the fund. One of the picket signs used by the Disabled Miners was introduced into evidence and read "United Mine Workers of America Pension and Welfare Board is Unfair to Disabled Miners, Widows and Orphans. It Could be you." A witness testified that another sign read: "Tony Boyle Unfair to Widows, Orphans and Disabled Miners, and it may be you." Though the pickets, in some instances, attempted to conceal their identity, evidence in the District Court indicated that none of them were currently employees of any of the Mine Operators. There was even some testimony that members of the union attempted to persuade the employees to cross the picket lines and continue working.

The pickets were characterized as being for the most part peaceful. They would appear at the mines in groups of three or four and stand around near theirs cars holding up the picket signs. It is clear, however, that the picketing was successful in curtailing a substantial portion of the coal production, not only in Kentucky, but in West Virginia and other states. The consumers affected by such curtailment were primarily

electric power generating plants and manufacturing plants located outside the State of Kentucky.

The United Mine Workers of America and the Mine Operators were parties to the National Bituminous Coal Wage Agreement of 1968. That collective bargaining agreement, which prescribes the terms and conditions of employment of plaintiffs' employees, was not open for modification or amendment at any time during the events of the present case.

The Disabled Miners first argue that Sections 1 and 4 of the Norris-LaGuardia Act preclude the District Court from issuing an injunction to stop the picketing of the plaintiffs' mines. However, we do not pass upon this issue because we conclude that for the reasons hereinafter expressed the District Court was without jurisdiction to entertain the suit.

As stated earlier, the District Court found that the Disabled Miners violated Section 1 of the Sherman Act by entering into a combination and conspiracy to shut down a major portion of the production of coal in the United States. In reviewing that finding, it is incumbent upon us to determine from the evidence in the District Court whether the Sherman Act has application to the kind of restraint of trade or commerce shown to exist. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The Mine Operators contend that the picketing was violative of Section 1 of the Sherman Act; Section 1 of the Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

While the history of the Sherman Act is too well known to require extensive recitation herein, a brief review of that history may aid in understanding the kind of activity aimed at by the Act.

From the time of the passage of the Sherman Act in 1890, the federal courts have struggled with the question of the scope of coverage of the Act where disputes within the industries affecting interstate commerce have occurred. The Act was passed during a period of big business monopolies and trusts, when a great deal of power to control the marketing of goods was concentrated in a few hands resulting in the virtual elimination of competition in some product markets. The Supreme Court, however, held that the Sherman Act applied not only to business monopolies and other similar restraints to competition, but also to the activities of labor unions engaged in concerted actions in the furtherance of their own economic self-interest. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908).

Congress then reacted to the Supreme Court's application of the Sherman Act to union activities by enacting, among others, the Clayton Act in 1914 and the Norris-LaGuardia Act in 1932. These statutes showed clearly Congress' intent that such activities be left outside the coverage of the Sherman Act. The federal courts were thereby deprived of jurisdiction to employ the injunction against stoppages of the flow of goods in interstate commerce due to legitimate "labor disputes" between employers and unions.

In 1940, in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), the Supreme Court reviewed the scope of the Sherman Act in light of its background and history and concluded that the Act is aimed at prohibiting schemes effecting anti-competitive and monopolistic market controls and not at policing internal industrial disputes even where such disputes result in substantial stoppages of the flow of goods in interstate commerce. 310 U.S. at 487, 60 S.Ct. at 988. In characterizing the types of restraints condemned by the Sherman Act, the Supreme Court stated the following:

"The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman law. They were contracts for the

restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market.

\*　\*　\*　\*　\*　\*

"[The Supreme Court has] repeatedly recognized that the restraints at which the Sherman law is aimed, and which are described by its terms are comparable to restraints deemed illegal at common law \* \* \*." 310 U.S. at 497–498, 60 S.Ct. at 994.

Mr. Justice Stone, speaking for the majority in *Apex Hosiery*, emphasized that the essential inquiry in finding a Sherman Act violation requires a determination of the purpose or object of the persons effecting the restraints of trade or commerce. 310 U.S. at 501. There was no finding in the present case that the Disabled Miners entered into a conspiracy to fix or raise prices or to divide marketing territories or to restrict competition in a manner forbidden by the Sherman Act. Nor was there any finding in the District Court that their activities had the effect of incurring such restraints. To the contrary, it was in the interest of the Disabled Miners to see that the very mines they picketed prospered, because the more coal the mines produced, the greater the royalties to be paid into the Welfare and Retirement Fund. Common sense would dictate that the Disabled Miners would not picket to drive out of business or to injure competitively the same companies responsible for sustaining the fund upon which the Disabled Miners depend for their income.

Subsequent to the *Apex Hosiery* decision, the Supreme Court has continued to adhere to the view that the Sherman Act was aimed at proscribing anti-competitive trade practices and business monopolies resulting in price control or market control. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S. Ct. 1533, 89 L.Ed. 1939 (1945); United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L. Ed. 973 (1947); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Allen Bradley, supra,* the Supreme Court held that unions could be enjoined from violations of the Sherman Act where they combined with non-labor groups to monopolize and restrain trade in interstate commerce. In other words, where unions combine with business to restrain trade, and thus step outside their normal activities in pursuit of their own economic self-interest, they were within the coverage of the Sherman Act. Thus the *Allen Bradley* decision appears to be entirely consistent with *Apex Hosiery*.

The argument has been made in this court that, notwithstanding *Apex Hosiery*, trade union activities and the picketing activities disclosed in the present case fall within the general language of the Sherman Act and would, therefore, be illegal except for the exemptions granted by the Clayton and Norris-LaGuardia Acts.

Such argument could conceivably draw support from a Supreme Court decision rendered one year after *Apex Hosiery*, United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). In *Hutcheson*, two unions were engaged in a controversy over which of them would be permitted to perform certain work on a construction site. One of the unions demanded that the company give the jobs to it and upon the company's refusal, the union retaliated by calling a strike. In deciding whether the strike was enjoinable either under the Norris-LaGuardia Act or Section 20 of the Clayton Act, 29 U.S.C. § 52, or was violative of Section 1 of the Sherman Act, the Court adopted its famous "interlacing statutes" rationale to find peaceful trade union activity exempted from federal court injunctions under the Sherman Act. The Court reasoned that the three Acts were to be read together "as a har-

monizing text of outlawry of labor conduct," 312 U.S. at 231, 61 S.Ct. at 466, and so long as such activity is within the bounds of a "labor dispute" as redefined under the Norris-LaGuardia Act, it is protected from liability under the Sherman Act.

The Hutcheson Court thus chose to focus upon the definition of a "labor dispute" in determining the Sherman Act to be inapplicable to the criminal prosecution involved in that case. However, as Justice Stone pointed out in his concurring opinion, the Court could just as readily have found such activities to be outside the scope of the Sherman Act through a reading of the Act itself. 312 U.S. at 237, 61 S.Ct. 463. We conclude that simply because the Court based its holding upon the words "labor dispute" under the Clayton and Norris-LaGuardia Acts in *Hutcheson* and similar cases following *Apex Hosiery* rather than relying upon an interpretation of the Sherman Act to find that the trade union activities were not the kinds of restraints of trade or commerce aimed at by the Sherman Act does not mandate that *Apex Hosiery* is no longer valid. *Hutcheson*, in its focus upon the Clayton and Norris-LaGuardia Acts, never discussed the scope of the Sherman Act, and cannot therefore be deemed to have in any way detracted from the Court's discussion of that issue in *Apex Hosiery*.

*Apex Hosiery* outlined the scope of coverage of the Sherman Act in language which very clearly declared that not all activity found to be within the literal wording of the Sherman Act is covered thereby. The Court stated: "In the cases considered by this Court since the Standard Oil case in 1911 [Standard Oil Co. [of New Jersey] v. United States, 221 U.S. 1, [31 S.Ct. 502, 55 L. Ed. 619] (1911)] some form of restraint of commercial competition has been the *sine qua non* to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price." 310 U.S. at 500, 60 S.Ct. at 996. In the instant case, there was no evidence that the Disabled Miners picketed to affect the market price of coal or that their picketing brought about that result.

We simply conclude that the Sherman Act is not the proper vehicle for regulating every work stoppage due to an internal industrial dispute. While we are not dealing with a labor union, we are considering an association of former mine workers who are picketing because they are involved in a dispute concerning the benefits they are receiving from the Welfare and Retirement Fund set up by a collective bargaining agreement between the Mine Operators and the union. The Sherman Act was not designed to prevent any work stoppages such an association might bring about. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S. Ct. 982, 84 L.Ed. 1311 (1940); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922).

The Disabled Miners also raised the issue in the District Court and on appeal as to whether their picketing was protected activity under the First Amendment. On this question we note that it was not the Disabled Miners who went out on strike, it was the Mine Operators' employees who refused to cross the picket lines, even though the union itself did not support the strike. The work stoppage was made possible because of the refusal of the mine workers to cross the picket lines although the picketers were not members of the union. Thus, we recognize the presence of a First Amendment issue, but in light of our decision under the Sherman Act, find it unnecessary to reach this problem.

The preliminary injunction granted by the District Court for the Eastern District of Kentucky against the defendants therein is vacated and the cause is dismissed.