**JOHNSTON DEVELOPMENT GROUP, INC., et al., Plaintiffs,**

v.

**CARPENTERS LOCAL UNION NO. 1578, et al., Defendants.**

**Civ. A. No. 89–566 (SSB).**

United States District Court, D. New Jersey.

May 10, 1989.

---

Blank, Rome, Comisky & McCauley by Jerald R. Cureton, Howard R. Flaxman, Cherry Hill, N.J., for plaintiffs.

Williams & Connolly by Aubrey M. Daniel, III, Kevin J. Hasson, Peter W. Chatfield, Washington, D.C. and Moss, Powers & Kugler by Robert B. Kugler, Moorestown, N.J., for defendants.

## OPINION

BROTMAN, District Judge.

Presently before the court is the application of plaintiffs, Johnston Development Group, Inc. and Glassboro Development Co., Inc., for a temporary restraining order enjoining the defendants, Carpenters Local Union No. 1578, Frank Spencer, Ronald Jurnegan and "others acting in concert with them," ("Carpenters" or "the Union") from representing to prospective customers of plaintiffs that buying a home at plaintiffs' Hidden Creek development constitutes a health risk as a result of its close proximity to the Lipari Landfill.

FACTS AND PROCEDURE

Johnston Development Group, Inc., in a joint venture with Glassboro Development Co., Inc. d/b/a Plank Run Developers Partnership, L.P., is developing a residential subdivision known as "Hidden Creek." The subdivision is located in Glassboro, New Jersey, and is less than one mile from the Lipari Landfill, which is currently ranked number one on the United States Environmental Protection Agency's Superfund cleanup list. While plaintiffs do not directly employ any carpenters—union or non-union—or other trades persons in their development, they do subcontract all construction work to other companies and those companies apparently do not employ union carpenters.

In the fall of 1988, Carpenters Local 1578 began picketing the Hidden Creek development.[1] In response to the picketing, plaintiffs filed an "unfair labor practice" charge with the National Labor Relations Board (NLRB or "Board"), alleging that the Union's actions violated sections 8(b)(4)(i) and

---

1. Plaintiffs claim that the picketing was aimed at forcing them to replace their non-union carpentry subcontractor with subcontractors employing union carpenters.

(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B), as amended.[2]

After an investigation, the NLRB filed an injunction action with this court, pursuant to 29 U.S.C. § 160(*l*),[3] to enjoin what the Board had determined to be an unfair labor practice. The parties (the NLRB and the Union) settled the dispute by entering into a Stipulation on October 28, 1988, whereby the Union agreed to stop picketing the Hidden Creek site. *See* Stipulation and Order, attached to plaintiff's Memorandum of Law as Exhibit F.

Subsequently, on February 8, 1989, plaintiffs filed the complaint in this action, alleging, *inter alia,* violations of the Racketeer Influenced and Corrupt Organizations law, antitrust law, and 29 U.S.C. § 158(b)(4)(ii)(B)[4], as well as various state tort claims. Besides its prayer for monetary relief, the complaint requests that the court preliminarily and permanently enjoin the defendants' unlawful conduct (which, the complaint alleges, goes far beyond simple picketing to include extortion, violence and threats of violence), pursuant to section 7 of the Norris–LaGuardia Act, 29 U.S.C. § 107.

Thereafter, beginning on or about February 18, 1988, and continuing on February 19 and every weekend until April 14, 1989, between two and five members of the union, dressed in white decontamination suits and wearing gas masks, have stood at or near the entrance to Hidden Creek and distributed handbills identical to those attached to plaintiff's Memorandum of Law as Exhibits A and B. Basically, the pamphlets, with the aid of somewhat hyperbolic —but not clearly false—language, photos and drawings, warned prospective home buyers of the potential dangers of living so close to the Lipari Landfill. Except for some very small print stating that they were paid for by Carpenters Local 1578, the pamphlets contain no indication of the underlying labor dispute.

■ Plaintiffs responded to this latest union tactic in two ways. First, they amended their complaint in the underlying lawsuit to include the incidents of handbilling as examples of the defendants' alleged unlawful activity. Second, plaintiffs filed another unfair labor practice charge with the National Labor Relations Board alleging, once again, a violation of § 158(b)(4)(i) and (ii)(B).[5] This time, however, after an investigation of plaintiffs' allegations, the Regional Director of the Board refused to issue a complaint, stating: "[T]he handbill-

---

**2.** Section 158(b) states, in pertinent part:
 It shall be an unfair labor practice for a labor organization or its agents—
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an objective thereof is—

 . . . . .

 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person. . . .

**3.** Also known as § 10(*l*) of the National Labor Relations Act.

**4.** Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (originally enacted as the Taft–Hartley Act), allows persons injured by violations of § 158(b)(4) to sue the labor organization or other offending party for damages resulting from the unfair labor practice.

**5.** At oral argument on April 14, 1989, the Court inquired of counsel as to whether the defendants' present activities could be considered a violation of the Stipulation entered into between the NLRB and the Union and approved by this court on October 28, 1988. At that time, both parties indicated that they had not really considered the issue but that they would address it at a later time. Subsequently, plaintiffs have alleged that the Union's present conduct is in violation of the October, 1988, Stipulation and the defendants have argued otherwise. As discussed below, the court has determined that defendants are not in violation of the Stipulation. Furthermore, the court feels that if such a violation were to occur, it would be up to the NLRB, under the terms of § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), and of the Stipulation itself, to petition the court for injunctive relief.

ing engaged in by the Union did not constitute picketing." *See* Letter of Regional Director of NLRB, attached to plaintiff's Memorandum of Law as Exhibit H. The Regional Director went on to state that, even if the handbilling had a secondary object within the meaning of § 158(b)(4)(i) and (ii)(B), it was not necessarily unlawful. *Id.* The Director relied on the recent Supreme Court decision in *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council and NLRB*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), in which the Court stated that there is no "clear indication in the relevant legislative history that Congress intended § 8(b)(4)(ii) to proscribe peaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer." *Id.* 108 S.Ct. at 1402. Plaintiffs appealed the Regional Director's decision to the General Counsel of the NLRB and on May 4, 1989, the General Counsel affirmed the Regional Director's refusal to issue an unfair labor practice complaint.[6]

Because of—or in spite of—the NLRB's refusal to issue a complaint against the defendants' most recent activity, plaintiffs first sought a temporary restraining order in the Chancery Division of New Jersey Superior Court. Before their claim could be heard, however, plaintiffs voluntarily dismissed their state case and brought this virtually identical application before this court seeking to enjoin the Carpenters from distributing the handbills at the Hidden Creek development.

Oral argument and fact-finding hearings were held by this court on April 14, 21 and 27, 1989, and the parties have also conducted settlement negotiations. It was during one of these negotiating sessions on April 14, 1989, that the Union agreed to limit the number of handbillers present at Hidden Creek at any one time to two, to cease wearing the decontamination suits and gas masks, and to revise its handbills to contain less inflammatory language.[7] Plaintiffs, however, are not satisfied with these remedial measures and still seek injunctive relief on the grounds that the Union's actions constitute malicious libel and tortious interference with prospective contractual relations.

## DISCUSSION

Before the court may address the merits of plaintiffs' claim, it must determine whether it may hear the matter at all, as there is a serious question as to whether federal labor law divests this court of jurisdiction over this dispute.[8]

---

**6.** The General Counsel's decision states, in pertinent part:

The appeal is denied substantially for the reasons set forth in the Regional Director's letter of March 21, 1989.... Further, with regard to your contentions about the Act's restrictions on handbilling, the United States Supreme Court held recently that Section 8(b)(4) of the Act [29 U.S.C. § 158(b)(4) ] does not prohibit publicity, not involving picketing, urging a consumer boycott of neutral employers, at least where such appeals are peaceful and truthful. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council and NLRB*, 485 U.S. 568, 108 S.Ct. 1932 [1392 [99 L.Ed.2d 645] (1988). A review of all documents submitted by both parties, including EPA reports on the Lipari landfall [sic], State of New Jersey health reports, and newspaper articles thereon, did not support your contention that the brochures were so misleading or wrong to be untruthful within the meaning of the Act. Nor was there sufficient probative evidence to establish that the handbillers engaged in coercive conduct, as alleged. In these circumstances, our bur-

den of establishing that the Union violated the Act as alleged could not be sustained.

The General Counsel's decision not to issue an unfair labor practice complaint is not reviewable by the courts. See *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 316, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138–39, 95 S.Ct. 1504, 1510–11, 44 L.Ed.2d 29 (1975); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). Furthermore, jurisdiction to review, set aside, or enforce orders of the NLRB is vested in the Court of Appeals, not the District Court. 29 U.S.C. § 160(f).

**7.** These provisional measures were undertaken voluntarily by the Union to address the plaintiffs' and the court's concerns regarding traffic hazards at the entrance to Hidden Creek and the potentially false or misleading message conveyed by the suits and masks that *Hidden Creek* was imminently dangerous to human life.

**8.** Of course, a federal court always has jurisdiction to determine its own jurisdiction. C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3581. As Wright and Miller

The basic question that must be answered by this court in determining its jurisdiction over the instant action is whether a federal district court has the power to enjoin "secondary" labor activity. Put simply, secondary activity, in the form of strikes, boycotts, picketing and appeals to consumers, is action taken by a union or other group not against the employer with whom they have a labor dispute, but against those who do business with the employer. The main purpose of such secondary activity is to force the employer to succumb to the union's demands by isolating it from the business community by cutting off its suppliers, customers and other economic partners.

The twentieth century has seen Congress continually refine and curtail the jurisdiction of the federal courts over both primary and secondary labor activity.[9] In the early 1900's, when labor unrest was at its peak, employers found a strong ally in the federal courts which were active in enjoining concerted labor activities, mainly through the application of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 et seq.[10] While passage of the Sherman Act was originally intended to combat the abusive practice of manufacturers combining to monopolize avenues of production and distribution, thus controlling prices and markets, the anti-labor courts of the era used it to frustrate the objectives of labor unions. In fact, in 1908 in *Loewe v. Lawlor*, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, the Supreme Court held a secondary boycott by members of a striking hatters' union to be illegal under the Sherman Law and sustained a private judgment for treble damages against individual employee defendants.

## A. *The Clayton Act*

In response to this judicial trend, Congress passed the Clayton Act of 1914 the purpose of which was "to equalize before the law the position of workingmen and employer as industrial combatants." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 484, 41 S.Ct. 172, 182–83, 65 L.Ed. 349 (1921). In particular, Section 20 of the Clayton Act, 29 U.S.C. § 52, was intended to "[withdraw] from the general interdict of the Sherman Law specifically enumerated practices of labor unions by prohibiting injunctions against them." *United States v. Hutcheson*, 312 U.S. 219, 229–30, 61 S.Ct. 463, 465, 85 L.Ed. 788 (1941).[11] While

note, "[i]f the jurisdiction of a federal court is questioned, the court has the power and the duty, subject to review, to determine the jurisdictional issue." *Id.* at § 3536 (citations omitted).

**9.** For a helpful summary of the history of American labor law, *see* R. Gorman, *Labor Law—Basic Text* 1–6 (1976).

**10.** The relevant portion of Section 1 of the Sherman Law states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1.

**11.** Section 20 states:
No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no ade-

quate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.
*And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from* terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means to do so; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from *ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do;* or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; *nor shall any of the acts specified in this para-*

the language of § 20 was clearly broad enough to protect all peaceful strike activity, whether primary or secondary, *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 438, 107 S.Ct. 1841, 1847, 95 L.Ed.2d 381 (1987) (9–0 decision), the early courts did not read it that way. In *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921) (overruled by the Norris–LaGuardia Act of 1932, 29 U.S.C. §§ 101–115, *see* discussion *infra*), the Supreme Court held that § 20 did not prevent courts from enjoining peaceful secondary strike activity. In reaching its conclusion, the Court apparently relied on some remarks made during the legislative debates on the bill and on its general view of the significance—both political and economic—of secondary picketing. According to the Court, secondary picketing could be enjoined because "Congress had in mind [the protection of] particular industrial controversies, not a general class war." *Id.* at 472, 41 S.Ct. at 178. *See also Burlington Northern*, 481 U.S. at 438, 107 S.Ct. at 1847.

### B. The Norris–LaGuardia Act

In 1932 Congress responded to this unduly restrictive judicial construction of the Clayton Act by passing the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115. The legislative history of the Act makes it clear that the intent of Congress was, once again, to attempt to limit the injunctive powers of the federal courts in labor disputes. As Representative LaGuardia stated in a speech typical of those in support of the bill:

> Gentlemen, there is one reason why this legislation is before Congress, and that

one reason is disobedience of the law on the part of whom? On the part of organized labor? No. Disobedience of the law on the part of a few Federal judges. If the courts had been satisfied to construe the law as enacted by Congress, there would not be any need of legislation of this kind. If the courts had administered even justice to both employers and employees, there would be no need of considering a bill of this kind now. If the courts had not emasculated and purposely misconstrued the Clayton Act, we would not today be discussing an anti-injunction bill.

75 Cong.Rec. 5478 (1932).[12] The Supreme Court, too, has recognized that the purpose of the Norris–LaGuardia Act was to revitalize and strengthen the protection which the Clayton Act had tried to provide to labor unions. *See United States v. Hutcheson*, 312 U.S. 219, 235–36, 61 S.Ct. 463, 468, 85 L.Ed. 788 (1941) ("The underlying aim of the Norris–LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction."). *See also, Burlington Northern*, 481 U.S. at 438, 107 S.Ct. at 1847.

The Norris–LaGuardia Act addressed the judicially-crafted loopholes in the Clayton Act in three ways. First, it declared that no restraining order or injunction could be issued contrary to the public policy as declared in the Act. 29 U.S.C. § 101. That statement of public policy, in essence, declared that employees be permitted to organize and collectively bargain free of employer coercion.[13]

---

graph be considered or held to be violations of any law of the United States. 29 U.S.C. § 52 (emphasis added).

**12.** *See also* 75 Cong.Rec. 5470 (1932) (statement of Rep. Browning) ("[I]nstead of [the Clayton Act] ... being construed as what the congress intended, it was denatured, emasculated, and tortured into an instrument for further oppression of those whom we sought to relieve.... As an example ... I refer you to the famous *Duplex* case"); *Burlington Northern*, 481 U.S. at 438–439, 107 S.Ct. at 1848.

**13.** The Act's declaration of public policy states, in part:

Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is neces-

Second, the Act removed any perceived distinction between primary and secondary labor disputes by extending its protection to those involved in any case *"involving or growing out of a labor dispute ...* regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. §§ 101 & 113(c) (emphasis added). *See also Burlington Northern,* 481 U.S. at 439, 107 S.Ct. at 1847; *United States v. Hutcheson,* 312 U.S. at 231, 61 S.Ct. at 465. Finally, the Norris–LaGuardia Act completely abolished the power of the federal courts to issue injunctions in certain enumerated instances, 29 U.S.C. §§ 104 & 105,[14] and severely limited the courts' power to enjoin labor activity in any case growing out of a labor dispute. 29 U.S.C. §§ 101, 107–09.[15]

If the statutory development of labor law had ended with the Norris–LaGuardia Act, then this court would, arguably, have jurisdiction over the instant dispute and the power to issue an injunction. It is clear that this case involves or grows out of a labor dispute thus invoking the jurisdiction of the Norris-LaGuardia Act. The Supreme Court has traditionally read the phrase "involving or growing out of a labor dispute" very broadly, *see Burlington Northern,* 481 U.S. at 440–42, 107 S.Ct. at 1848–49; *New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 560–61, 58 S.Ct. 703, 706–07, 82 L.Ed. 1012 (1938), and if the court correctly understands the true history of this case, it is clear that the present handbilling "grows out of" a labor dispute. Plaintiffs argue that the Carpenters' handbilling is an effort to force plaintiffs to fire their nonunion subcontractors and while defendants have denied this, the court finds it to be so from the record.[16]

---

sary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
29 U.S.C. § 102.

**14.** Among the situations when a court cannot, under any circumstances, issue a restraining order or an injunction are when the effect would be to:

prohibit any person or persons participating or interested in [a labor] dispute ... from ..., whether singly or in concert ...:
(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method *not involving fraud or violence;*
(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

. . . . .

(i) Advising, urging, or otherwise causing or inducing *without fraud or violence* the acts heretofore specified....
29 U.S.C. § 104 (emphasis added).

**15.** Before a court may issue any restraining order or injunction in a case involving or growing out of a labor dispute, it must hear the testimony of witnesses in open court and must make the traditional findings associated with a temporary restraining order. 29 U.S.C. § 107. In addition, the court must file findings of fact and the restraining order must be *very* narrowly

tailored. 29 U.S.C. § 109. In any event, no injunctive relief may be granted unless the complainant has made every reasonable effort to settle the dispute. 29 U.S.C. § 109.

**16.** The court notes that both parties have, over the course of this dispute, taken inconsistent positions as to whether this case "grows out of" a labor dispute. Defendants, in their papers, claim that their purpose in distributing the handbills at the Hidden Creek site is to inform the public of the proximity of the development to the Lipari landfill and the resulting risks of purchasing a home there. Defendants' Memorandum of Law at 2. However, if this is true, then the case does not "grow out of" a labor dispute and the court's jurisdiction to enter a restraining order is not limited by the Norris–LaGuardia Act.

On the other hand, *plaintiffs* claim in their Memorandum of Law that this case in no way involves or grows out of a labor dispute. Plaintiff's Memorandum of Law at 8. However, as discussed above, plaintiffs very recently filed unfair *labor* practice charges with the NLRB, claiming that the Carpenters' activities were illegal secondary picketing. Surely, plaintiffs cannot now be heard to argue that the same activity which they now ask this court to enjoin does not "grow out of" a labor dispute. Indeed, in their Memorandum plaintiffs claim that defendants' handbilling is aimed at forcing Johnston, Inc. "to terminate its contract with its non-union carpentry subcontractor, and to hire subcontractors employed by members of Local 1578." Plaintiffs' Memorandum of Law at 2. Certainly, such a motive, if true, involves a controversy concerning "terms or conditions of employment" within the Act's definition of a "labor dispute." 29 U.S.C. § 113(c).

Given the fact that this case grows out of a labor dispute, and if not for the operation of the National Labor Relations Act, *see infra*, the court's task would be to determine whether any of the specific prohibitions of the Norris–LaGuardia Act deprive it of jurisdiction to enjoin the union's activities. Absent such a specific prohibition, the court could, after making appropriate findings, grant plaintiffs' request for relief. This court's research reveals, however, that while the defendants' actions are not protected by any of the specific prohibitions of the Norris–LaGuardia Act, the National Labor Relations Act operates to deprive this court of jurisdiction over the matter.

### C. The National Labor Relations Act

In 1935 Congress passed the Wagner Act, better known as the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (NLRA), which expanded the reach of federal labor law, declaring:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .

29 U.S.C. § 157. Section 8 of the Act, 29 U.S.C. § 158, declared certain acts of employers, such as interfering with employees' exercise of their § 7 (§ 157) rights—to be illegal. These "unfair labor practices," as they were called, were to be monitored and policed by the quasi-judicial administrative agency created by the Act—the National Labor Relations Board. The NLRB was given exclusive jurisdiction to order the employer to remedy its unfair labor practices and to petition the United States District Court for injunctive relief. 29 U.S.C. § 160(a) & (j). Furthermore, the Act made final decisions of the Board reviewable by the Courts of Appeals.

Twelve years later, in response to what it felt to be overzealous persecution of employers by the NLRB and in an effort to stem an increasing tide of secondary strikes and boycotts by labor unions which it felt unfairly involved "innocent" third-parties in labor disputes, Congress amended the NLRA by adding a list of unfair labor practices by labor organizations.[17] Once again, the NLRB was given exclusive jurisdiction over the regulation of the unfair labor practices.

It is clear from a reading of the NLRA and relevant Supreme Court precedent that the NLRA governs the regulation of secondary labor activity and that the NLRB is vested with the exclusive authority to seek injunctions against prohibited forms of secondary activity. Indeed, in the recent case of *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 107 S.Ct. 1841, Justice Brennan, writing for a *unanimous* court, held:

> [T]he NLRA does not permit employers to seek injunctions against the activity that it does prohibit. It grants to the National Labor Relations Board (NLRB) exclusive authority to seek injunctions against some forms of secondary activity. Thus, congressional policy, as expressed in the NLRA, remains that employers are not permitted to obtain injunctions of secondary activity.

*Id.* at 448, 107 S.Ct. at 1853 (citations omitted). *See also Hirsch v. Building & Const. Trades Council*, 530 F.2d 298, 307–08 (3d Cir.1976).

Consistent with the mandate of the NLRA, plaintiffs, just as they had done in the fall of 1988, filed unfair labor practice charges with the NLRB alleging violations of § 158(b)(4)(i) and (ii)(B).[18] This time, however, the Regional Director of the Board refused to issue an unfair labor practice complaint (which would have enabled the Board to petition this court for a temporary injunction under 29 U.S.C. § 160(*l*) (a "10(*l*) injunction")). As dis-

---

**17.** *See* footnote 2 for the relevant text of the union unfair labor practices established by the 1947 amendment and another amendment in 1959.

**18.** *See* footnote 2.

cussed above, the Director based his decision on the recent Supreme Court case of *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (8–0 decision).[19]

In *DeBartolo,* the Court held unequivocally that "peaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer" is not proscribed by the terms of the NLRA, specifically § 158(b)(4)(ii). *Id.* 108 S.Ct. at 1402. As the court stated:

At no time did [the Congressional proponents of the NLRA] suggest that merely handbilling the customers of the neutral employer was one of the evils at which their proposals were aimed. Had they wanted to bar any and all nonpicketing appeals, through newspapers, radio, television, handbills or otherwise, the debates and discussions would surely have reflected this intention. Instead, when asked, Congressman Griffin, co-sponsor of the bill that passed the House, stated that the bill covered boycotts carried out by picketing neutrals but would not interfere with the constitutional right of free speech.

*Id.* In essence, the Court based its determination on two different factors. First, it refused to interpret the statute in a way that would raise serious constitutional—in this case, first amendment—problems. *Id.* at 1397 (citing *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979)). Second, the court held there to be a crucial distinction between "picketing" or "patrolling" and mere handbilling. The former, argued the court, "coerces" secondary employers in contra-

vention of the language of the Act, while handbilling does not:

[P]icketing is "a mixture of conduct and communication" and the conduct element "often provides the most persuasive deterrent to third persons about to enter a business establishment." ... The loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do.

*Id.* 108 S.Ct. at 1400 (citations omitted). In light of the above analysis, it is clear that the environmental cleanup suits worn by the defendants cannot be seen as "coercive" as their effect seems to have been to encourage prospective customers to accept and read the handbills (the "message") and not simply to be frightened off.[20] Furthermore, the fact that the defendants may have had an ulterior motive behind their "public interest" handbilling is irrelevant if the message itself is protected. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 911, 102 S.Ct. 3409, 3424, 73 L.Ed. 2d 1215 (1982) (8–0 decision) (citing *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed. 2d 1 (1971)).

The case at bar is factually strikingly similar to *DeBartolo* in the way the union conducted its secondary activity. In fact, the only major difference is that in the present case the handbills do not publicize the facts concerning the labor dispute, as specifically protected by § 158(b)(4)(ii).[21] However, the *DeBartolo* court dealt with this issue, concluding that the "publicity"

---

**19.** The Regional Director also stated that the fact that the handbillers wore gas masks and cleanup suits did not make the conduct "coercive" within the meaning of the Act. *See* discussion *infra.*

**20.** As discussed above, the court has expressed its concern over the potential falsity of the message conveyed by the suits and masks themselves. However, because defendants have voluntarily agreed not to wear them while handbilling at Hidden Creek, the court need not rule on the issue.

**21.** The "publicity proviso" of § 158(b)(4)(ii) states, in pertinent part:

[F]or the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer....

proviso of § 158 was meant to ensure that publicity regarding the fact that certain products are produced by a struck employer is not considered "coercive" under the section but is given the same protection as other types of peaceful publicity, *none* of which is an unfair labor practice under the NLRA. *Id.* 108 S.Ct at 1401.

In short, the NLRB has exclusive jurisdiction to determine whether secondary labor activity constitutes an unfair labor practice, and only the NLRB may bring an action in federal district court to enjoin such activity. A party aggrieved by the decision of a Regional Director of the Board may appeal to the General Counsel of the NLRB and any appeals from his decision must be taken directly to the United States Court of Appeals. Furthermore, even if the NLRB were to bring an action to enjoin the union's activities in this case, it appears that *DeBartolo* would prevent this court form granting an injunction or restraining order.

Plaintiffs advance two additional arguments in an attempt to invoke this court's jurisdiction. First, as discussed in footnote 4, above, plaintiffs contend that the Union's handbilling is in violation of the October 28, 1988, Stipulation entered into between the NLRB and the Union and approved by this court. This contention is without merit. The Stipulation itself is quite clear as to what union activity is proscribed; it prohibits efforts by the Carpenters to convince *employees*—not customers—of Johnston and its subcontractors and suppliers to cease doing business at Hidden Creek. Furthermore, Paragraph 2 of the Stipulation sets forth the procedure to be followed if a violation of its terms is deemed to have occurred. Significantly, only the NLRB ("the Petitioner") is given authority to request that the court reopen

its injunction proceeding.[22] Such language in the Stipulation is, of course, consistent with the provisions of the NLRA which give the NLRB sole authority to determine whether secondary labor activity is an unfair labor practice, and to bring an action in federal court to enjoin the activity. *See* 29 U.S.C. § 160. *See also Burlington Northern*, 481 U.S. at 448, 107 S.Ct. at 1852; *Hirsch*, 530 F.2d at 307–08.

On April 27, 1989, the Regional Director of the NLRB informed the court both in chambers and on the record that, not only did he feel that the Union's present activities do not constitute an unfair labor practice under the NLRA, but also that it was the Board's position that the defendants had not violated the October 28, 1988, Stipulation. As a result, the Regional Director requested that the court not take any action against the Union and suggested that the court lacked jurisdiction to do so in any event. The court is forced to agree.

Plaintiffs' other argument, upon which they have placed great weight and expended considerable energy, must also fail. Plaintiffs rely on a series of cases which hold that state and federal courts are not deprived of jurisdiction by federal labor law where a union circulates false and defamatory statements about another party during a labor dispute. *See, e.g., Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

While this court agrees with the reasoning behind these decisions, they are clearly inapplicable to the present case. What *Linn* and its progeny make clear is that for union activity such as that undertaken by the Carpenters to fall outside the preemptive jurisdiction of federal labor law, it *must* be *false*. As the Supreme Court stated in *Linn:*

---

22. Paragraph 2 of the Stipulation states:
 The hearing on the Petition for Injunction, filed herein, presently scheduled for November 1, 1988, is continued indefinitely, subject to call upon notice to Respondents [the Union] or their Counsel of record, should Petitioner [the NLRB] feel that Respondents subsequent to the date of this Stipulation have breached the provisions hereof.

It is important to note that the plaintiffs in the instant action, Johnston Development Group, *et al.,* were not even a party to the Stipulation. This is the normal practice for resolving unfair labor practices under the NLRA. *See, e.g., Hirsch*, 530 F.2d at 307–08.

**1184**

We conclude that where either party to a labor dispute circulates *false* and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him.

Id. at 55, 86 S.Ct. at 659 (emphasis added). While plaintiffs have, arguably, set forth facts sufficient to establish that the union's revised handbill has injured them (*see* Record of Testimony dated April 21, 1989), and has been distributed with malicious intent, they have not proven that the statements contained therein are false. Plaintiffs have presented testimony and supplied this court with numerous exhibits in an effort to establish that the Lipari landfill does not pose a threat to persons living nearby. However, plaintiffs have not presented sufficient evidence to carry their burden of proving that the statements contained in the Union's revised handbill are, in fact, false. Significantly, the handbill contains no opinions as to the dangerousness of the landfill. Instead, the union simply sets forth facts about the landfill—facts that the plaintiffs have not established to be false and the court accepts as true—and urges the public to "consider" and "investigate" the facts. Since plaintiffs have not presented any evidence that the "facts" presented in defendants' handbill are, indeed, false, the court is in no position to exercise jurisdiction over this matter under the *Linn* doctrine.

CONCLUSION

For the reasons stated above, the court must deny plaintiffs' application for a temporary restraining order. The court finds that its jurisdiction to grant injunctive relief is preempted by federal labor law and that the judicially crafted exception for *false and defamatory speech* does not apply to this case.

An appropriate order will be entered.