16-485-cv
*Conn. Ironworkers Emp'rs Ass'n v. New England Reg'l Council of Carpenters*

# In the
# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2016

No. 16-485-cv

CONNECTICUT IRONWORKERS EMPLOYERS ASSOCIATION, INC., MRS ENTERPRISES, INC., BARRETT, INC., ERNEST PETERSON, INC., BERLIN STEEL CONSTRUCTION CO., IRON WORKERS LOCAL NO. 15, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING, IRON WORKERS LOCAL 37, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING, IRON WORKERS LOCAL 424, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING, SHEET METAL WORKERS LOCAL 38 CRAFT TRAINING FUND, SHEET METAL WORKERS LOCAL NO. 40, INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES DISTRICT COUNCIL 11, AFLCIO, CLC, INTERNATIONAL UNION OF PAINTERS, ALLIED TRADES LOCAL UNIONS, GLAZIERS LOCAL UNION NOS. 1333 & 1274, GLAZIERS UNION, NO. 1333, GLAZIERS UNION, LOCAL NO. 1274,
*Plaintiffs-Appellants,*

v.

NEW ENGLAND REGIONAL COUNCIL OF CARPENTERS,
*Defendant-Appellee.*\*

---

\* The Clerk of Court is respectfully directed to amend the caption as shown above.

On Appeal from the United States District Court for the District of
Connecticut

ARGUED: DECEMBER 13, 2016
DECIDED: AUGUST 23, 2017

Before: JACOBS, CABRANES, and PARKER, *Circuit Judges*.

This case concerns a "turf battle" between Ironworkers and
Carpenters. The Ironworkers allege that the Carpenters used
restrictive subcontracting clauses in their collective bargaining
agreements ("CBAs") to secure work in the New England area that
historically belonged to the Ironworkers. The Ironworkers contend
that the Carpenters' conduct constitutes anticompetitive behavior in
violation of Sections 1 and 2 of the Sherman Antitrust Act and unfair
labor practices in violation of Sections 8(b)(4) and 8(e) of the
National Labor Relations Act ("NLRA").

The Carpenters counter that their subcontracting practices are
consistent with longstanding industry practices, including with
practices currently used by the Ironworkers. They assert, as an
affirmative defense, that such practices are protected from liability
by the "construction industry proviso" under Section 8(e) of the
National Labors Relations Act ("NLRA") and the judicially-created
"non-statutory exemption." To defeat the antitrust claim, the

2

Carpenters' conduct must come within the protection of both the construction industry proviso and the non-statutory exemption. However, to defeat the unfair trade practices claim, it only needs to satisfy the construction industry proviso.

On January 20, 2016, the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*) granted summary judgment to the Carpenters based on the affirmative defenses just described. It held that the disputed subcontracting practices were immune from both antitrust and unfair labor practices liability because they qualified for protection under the construction industry proviso *and* the non-statutory exemption.

We agree that the Carpenters have met the requirements of the construction industry proviso. But we conclude that, on this record, there are factual disputes that preclude a decision on whether the conduct falls within the non-statutory exemption. To demonstrate that the disputed subcontracting practices are sheltered by the non-statutory exemption (and thus to defeat the Ironworkers' antitrust claim completely), the Carpenters must show that these practices furthered legitimate aims of collective bargaining in a way that is not unduly restrictive of market competition. Absent additional fact-finding by the District Court as to whether the Carpenters' subcontracting practices further legitimate labor goals, it cannot undertake the analysis required by our precedents.

Accordingly, we **VACATE** the judgment of the District Court as to the Sherman Act claim, **AFFIRM** the judgment as to the unfair labor practices claim, and **REMAND** the cause to the District Court for further proceedings consistent with this opinion, including for

3

such additional discovery as will permit the District Court to be informed of the relevant history and permit the parties to move for summary judgment or, if necessary, to proceed to trial.

———————

PAUL C. HETTERMAN, Hartnett Gladney Hetterman, LLC, St. Louis, MO (Ronald C. Gladney, Hartnett Gladney Hetterman, LLC, St. Louis, MO; Thomas W. Meiklejohn, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT; *on the brief*),  *for Plaintiffs-Appellants*.

KEITH P. CARROLL, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Boston, MA (Christopher N. Souris, Krakow & Souris LLC, Boston, MA; Kevin McGinty, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Boston, MA; Bruce D. Sokler, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Washington, DC; *on the brief*),  *for Defendant-Appellee*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

Much of the practice of American antitrust law consists of deciding whether particular conduct is, or is not, "exempt" from the

4

application of the antitrust statutes by virtue of immunities conferred by later legislation or judicial interpretation. The celebrated fourteen-volume treatise of Professor Philip E. Areeda devotes fully two volumes to these numerous immunities.[1] The history of these immunities is "rich and fascinating . . . com[ing] in waves. Each particular wave has involved a distinct approach and rested on its own economic justification."[2]

We consider here the latest chapter in the unfolding story of one of those immunities—those that exempt certain labor union activities. Professor Ralph K. Winter (as he then was) characterized this topic as "one of the most disputed legal issues of this century."[3]

[1] 1B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION C2-2, 3 (4th ed. 2013).

[2] AM. BAR ASS'N, SECTION OF ANTITRUST LAW, FEDERAL STATUTORY EXEMPTIONS FROM ANTITRUST LAW 1–4, 31–52 (2007). The most fundamental of these exemptions is also the most obvious: governmental actions. *See Hoover v. Ronwin*, 466 U.S. 558, 568 (1984) ("actions of the State . . . ipso facto are exempt from the operation of the antitrust laws"). There are dozens of other immunities to antitrust scrutiny as well. Some are express, such as statutory carve-outs for sports broadcasting, 15 U.S.C. § 1291, or the business of insurance, 15 U.S.C. §§ 1011–15; others are implied, such as judicially-devised exemptions intended to preserve the integrity of a regulatory scheme like the baseball exemption, *Federal Baseball Club, Inc. v. National League of Professional Baseball Clubs*, 259 U.S. 200, 208–09 (1922), or the filed-rate doctrine, *Keogh v. C. N.W. RY. Co.*, 260 U.S. 156 (1922).

[3] *See* Ralph K. Winter, Jr. *Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities*, 73 YALE L. J. 14, 14 (1963). At the time of the publication of this paper, now-Judge Ralph K. Winter was a junior member of the Yale Law School faculty, who would later become the William K. Townsend Professor at Yale Law School.

We address only a piece of this storied immunity: the exemption for certain union activities within the construction industry.

This case arises out of a dispute over subcontracting clauses in collective bargaining agreements ("CBAs") between the defendant New England Regional Council of Carpenters (the "Carpenters Union" or "Carpenters") and various construction companies and construction managers. These clauses effectively bar subcontracting of construction work with non-Carpenter affiliates. The plaintiffs, consisting of several other unions, employers, trade associations, and union pensions funds (jointly, the "Ironworkers"), allege that the Carpenters have used these subcontracting clauses to expand the scope of work assigned to the Carpenters Union to include work traditionally assigned to the Ironworkers. The Ironworkers bring two claims against the Carpenters: first, that the Carpenters' conduct constitute anticompetitive behavior in violation of Sections 1 and 2 of the Sherman Antitrust Act[4] and second, that the Carpenters' conduct constitutes unfair labor practices in violation of Sections 8(b)(4) and 8(e) of the National Labor Relations Act ("NLRA").[5] The Carpenters counter that their subcontracting practices are shielded from both antitrust liability and claims of unfair labor practices.

---

[4] 15 U.S.C. §§ 1–2.

[5] Pub. L. No. 74-198, § 8(e), 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 158(b)(4) and (e)). The unfair labor practices claims are brought under 29 U.S.C. § 187 ("[It is] unlawful . . . in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in [Section 8(b)(4) of the NLRA].").

To determine if the disputed subcontracting practices[6] are protected from antitrust liability, we must assess whether *both* the "construction industry proviso" of Section 8(e) of the NLRA[7] and the judicially-created "non-statutory exemption"[8] to antitrust liability apply.[9] To defeat the unfair labor practices claim, the Carpenters need only show that their conduct fall within the statutory construction industry proviso.

In the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), the Carpenters moved for

---

[6] We use the term "subcontracting practices" to refer to both the Carpenters' restrictive subcontracting clauses in their CBAs as well as the enforcement of those clauses.

[7] Section 8(e) generally prohibits the adoption of "hot cargo" clauses in CBAs, "by which unions would secure agreements from employers to boycott the goods and services of other employers that did not comply with union standards or recognize a union." 29 U.S.C. § 158(e). However, it also provides an exemption for employers and employees in the construction industry regarding the contracting and subcontracting of work—*i.e.*, the construction industry proviso—allowing them to include restrictive "hot cargo" contracting clauses in their CBAs. *Id.*

[8] The courts devised the "non-statutory exemption" to antitrust liability, which "permits certain union-employer agreements" despite some potential anti-competitive effects, in order to "balance[ ] the conflicting policies embodied in the labor and antitrust laws, with the policies inherent in labor law serving as the first point of reference." *Local 210, Laborers' Int'l Union of N. Am. v. Labor Relations Div. Associated Gen. Contractors of Am., N.Y.S. Chapter, Inc.* ("*Local 210*"), 844 F.2d 69, 79 (2d Cir. 1988).

[9] *Local* 210, 844 F.2d at 73 ("[Subcontracting C]lauses . . . are vulnerable to challenge under federal antitrust law unless they are protected both by the construction industry proviso and by an exemption from antitrust scrutiny."

summary judgment based on the affirmative defenses just described and the Court granted their motion. Specifically, the District Court held that the disputed subcontracting practices were immune from both antitrust and unfair labor practices liability because they qualified for protection under the construction industry proviso *and* the non-statutory exemption.

We agree that the Carpenters have met the requirements of the construction industry proviso, but we conclude that, on this record, there are factual disputes that preclude a decision on whether the conduct falls within the non-statutory exemption. To demonstrate that the disputed subcontracting practices are sheltered by the non-statutory exemption (and thus to defeat the Ironworkers' antitrust claim completely), the Carpenters must show that these practices furthered legitimate aims of collective bargaining, in a way that is not unduly restrictive of market competition. Absent additional fact-finding by the District Court as to whether the Carpenters' subcontracting practices further legitimate labor goals, it cannot undertake the analysis required by our precedents.[10] Establishing that these subcontracting agreements arose from a lawful CBA is not, in and of itself, sufficient to gain the protection of the non-statutory exemption.

Accordingly, we **VACATE** the judgment of the District Court as to the Sherman Act claim, **AFFIRM** the judgment as to the unfair labor practices claim, and **REMAND** the cause to the District Court

---

[10] *Id.*

8

for further proceedings consistent with this opinion, including for such additional discovery as will permit the District Court to be informed of the relevant history and permit the parties to move for summary judgment or, if necessary, to proceed to trial.

## BACKGROUND

This case concerns what some might call a "turf battle" between the Ironworkers and the Carpenters Union. The plaintiff Ironworkers are a group of construction organizations including: a district council, seven locals affiliated with construction trade unions, four construction contractors, and two trade groups.[11] The defendant Carpenters Union is a labor organization that operates throughout New England.

The Ironworkers challenge the enforcement of restrictive subcontracting clauses in the Carpenters' CBAs. These clauses, colloquially called "hot cargo" clauses, bar signatories from subcontracting work to any employer that is not also a signatory to a Carpenters' CBA.[12] The Ironworkers argue that the Carpenters use

---

[11] The plaintiffs include several unincorporated associations and labor organizations, which fall within the scope of Section 2 of the NLRA, 29 U.S.C. § 152(5). Section 2 defines a labor organization as: "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

[12] For example, the Carpenters' CBAs with Rhode Island and Western Massachusetts contractors state that the employer "will not subcontract any work covered by this Agreement . . . except to contractors who are parties to a collective bargaining agreement with the Union, or to a contractor who is willing

9

these subcontracting clauses to act in concert with various non-party general contractors and construction managers to prevent the Ironworkers from performing the relevant work.[13]  In other words, they allege that the Carpenters designed and enforced the disputed clauses not to further legitimate goals of collective bargaining, such as protecting wages, but rather, to secure work in the New England area that allegedly belonged to the Ironworkers.  Accordingly, they claim that these subcontracting practices violate the antitrust laws and constitute unfair labor practices.

The Carpenters counter that these subcontracting practices are commonplace in the construction industry, and point to similar provisions in CBAs to which the Ironworkers are signatories. They assert, as affirmative defenses, that these practices are immune from antitrust liability and unfair labor practices claims because they fall within the construction industry proviso of Section 8(e) of the NLRA and the judicially-devised non-statutory exemption to antitrust

---

to sign a collective bargaining agreement with the Union. . . .” Supplemental App’x (“SA”) 465 (Rhode Island); SA 555 (Western Massachusetts). The Carpenters’ CBA with Connecticut contractors provides that “[a]ny subcontractor on the site shall be covered by and subject to the terms of this Agreement . . . .” SA 522.

[13] The “relevant work” at issue in the case includes: exterior building enclosure systems such as exterior metal panels, composite wall panels, foam panels, and insulated panel systems; exterior panelized window systems, punched windows, curtain wall, store fronts; and metal roofing systems and related components. The relevant work has been the subject of a series of jurisdictional disputes between the parties. The “relevant market area” is Connecticut, Rhode Island and Western Massachusetts, where there were 8,030 construction projects between 2009 and 2014. **[Def. Br. at 46]**

liability.

The Ironworkers do not dispute that these subcontracting clauses have long existed, but they argue nonetheless that enforcement of the subcontracting provisions—namely, acting in concert with various non-party general managers—only started between 2005 and 2006.[14] They assert that such enforcement impinges on work traditionally performed by Ironworkers and conflicts with historical industry practice. The primary purpose of these subcontracting practices, they argue, is to force parties to enter into CBAs with the Carpenters as opposed to other labor organizations.

Specifically, the Ironworkers identify seven examples of general contractors or construction managers who executed an agreement with the Carpenters to assign relevant work to Carpenters' signatories, in accordance with the Carpenters' CBAs: (1) Suffolk Construction Company, 360 State Street Project, New Haven, Connecticut; (2) Dimeo Construction, New Rowe Residences, New Haven, Connecticut; (3) Turner Construction, St. Francis Hospital, Hartford, Connecticut; (4) Bond Brothers, Bryant University Project, Smithfield, Rhode Island; (5) E. Turgeon, Immaculate Conception Catholic Regional School, Cranston, Rhode Island; (6) Berry & Sons, Bay State Medical Center Hospital Project,

---

[14] Pls.' Br. at 6.

Springfield, Massachusetts; and (7) Fusco, Inc., Schools Project, New London, Connecticut.[15]

The Carpenters moved for summary judgment on both of the plaintiffs' claims, which the District Court granted on January 20, 2016.[16] The Ironworkers filed a timely appeal.

## DISCUSSION

We review *de novo* orders granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[17] Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18] The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.[19]

We apply the same standard "whether summary judgment is

---

[15] For a detailed description of each project, *see Connecticut Ironworkers Employers Association v. New England Regional Council of Carpenters*, No. 10-cv-165, 2012 WL 951793, at *4–*5 (D. Conn. March 10, 2012).

[16] *Conn. Ironworkers Emp'rs Ass'n v. New England Reg'l Council of Carpenters*, 157 F. Supp. 3d 173, 188 (D. Conn. 2016); Special App'x 27 (judgment).

[17] *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).

[18] Fed. R. Civ. P. 56(a).

[19] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992); *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015).

granted on the merits or on an affirmative defense. . . ."[20] Accordingly, if a movant meets his or her burden by introducing evidence sufficient to establish an affirmative defense, the nonmovant must introduce evidence to establish that a genuine dispute of material fact exists.[21]

As noted above, this dispute turns on two legal questions. The first is whether the construction industry proviso applies to the Carpenters' subcontracting practices, which requires us to determine, among other things, whether these practices arose in the context of a collective bargaining relationship. The second is whether the judicially-devised "non-statutory exemption" applies to those same practices, which requires us to weigh the impact on the relevant market and the competing interests of our national labor and antitrust policies. The Carpenters' subcontracting practices must come within the protection of *both* the construction industry proviso and the non-statutory exemption to defeat the antitrust claim, but need only satisfy the proviso to defeat the unfair labor practices claim.

## I.     Historical Context

We first turn to the historical context in which the construction industry proviso and "non-statutory exemption" came into existence. This historical inquiry is not merely an exercise in

---

[20] *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2009) (citing *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995)).

[21] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

13

curiosity. We are required by the Supreme Court to read the construction industry proviso in Section 8(e) "in light of the statutory setting and the circumstances surrounding its enactment."[22] Similarly, in applying the "non-statutory exemption," we have been instructed to "balance[] the conflicting policies embodied in the labor and antitrust laws"—policies that can only be viewed in light of Congress's intent at the time of their enactment.[23] Both tasks thus *require* us to delve into the historical context.

This "irreconcilable" conflict between our labor and antitrust policies has not only been the topic of many academic works,[24] but has also been at the center of an emotionally charged national debate

---

[22] *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 628 (1975).

[23] *Local 210*, 844 F.2d at 79.

[24] Winter, *ante* note 3, at 16. To give a brief sketch of this debate, some experts like the late Clyde Summers argued for broad labor powers and exemptions from antitrust laws. Summers contended that "[u]nions, in bargaining, are not private organizations but are governmental agencies garbed with the cloak of legal authority to represent all employees in the unit and armed with the legal right to participate in all the decisions affecting terms and conditions of employment." Clyde Summers, *Union Powers and Workers' Rights*, 49 MICH. L. REV. 805, 811 (1951). Other authorities asserted that the monopolistic status of unions undermines the freedom of workers' individual rights to contract and compete. They argued for narrow labor powers. *See, e.g.,* FRIEDRICH A. HAYEK, THE CONSTITUTION OF LIBERTY 267 (1960) ("[W]e have now reached a state where [unions] have become uniquely privileged institutions to which the general rules of law do not apply."). For purposes of this opinion, we merely note that the dispute between our antitrust and labor policies has been fiercely contested for generations. *See generally* CLYDE W. SUMMERS & HARRY H. WELLINGTON, LABOR LAW Chap. 1 (1968).

for most of the twentieth century.[25]  In some sense, this conflict was inevitable: the central aim of our antitrust laws is to promote competition, while the central aim of collective bargaining is to reduce or eliminate competition for labor in order to strengthen the bargaining power of workers.[26] For over a hundred years, the difficult and delicate task of mediating this conflict has largely fallen to the federal courts.

With the passage of the Sherman Antitrust Act in 1890, Congress declared illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade."[27] The Sherman Act was largely directed at business monopolies and trade restraints, but it was

---

[25] One observer even suggested that "regulation of union activity under the Sherman Act [by the federal judiciary] undermined judicial prestige in the minds of the American public and labeled the Sherman Act as a weapon of class war that would be an emotional symbol to future generations." F. Kevin Loughran, *Antitrust Law—Labor Law-Illegal Hot Cargo Agreement May Be the Basis of Antitrust Suit Against Union Which Coerces Its Acceptance*, 61 CORNELL L. REV. 436, 437 (1976). At the very least, we can say with certainty that this debate extended well beyond the ivory tower. *See, e.g.,* W.L. White, *Should Unions Have Monopoly Power?*, READER'S DIGEST (Aug. 1955).

[26] Chief Justice Taft captured this labor ambition in his famous statement:

[Labor unions] were organized out of the necessity of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers an opportunity to deal in equality with their employer.

*Am. Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 209 (1921).

[27] 15 U.S.C. § 1 *et seq.*

almost immediately invoked against unions.[28] Indeed, in the early 1900s, the federal courts held unions liable for antitrust violations to nearly the same extent as manufacturers.[29]

In response, Congress adopted the Clayton Antitrust Act of 1914[30] aimed, in part, to protect peaceful labor activities from the reach of antitrust laws and limit the issuance of judicial injunctions in labor disputes. Section 6 declared that labor was "not a commodity or article of commerce," and that the Sherman Act should not be "construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the

---

[28] *See, e.g.*, Harry Shulman, *Labor and the Anti-Trust Laws*, 34 ILL. L. REV. 769, 769 & n.2 (1940) (discussing *United States v. Workingmen's Amalgamated Council*, 54 F. 994 (E.D. La. 1893)); *see also United States v. Debs*, 64 F. 724, 765 (N.D. Ill. 1894) (imposing an injunction under the Sherman Act against Eugene V. Debs, President of the American Railway Union, and other leaders of the Pullman strike of 1894).

[29] Robert G. Conway, *Connell*: *Broadening Labor's Antitrust Liability While Narrowing Its Construction Industry Proviso Protection*, 27 CATH. U. L. REV. 305, 306 (1978).

[30] The Clayton Act, Pub. L. 63-212, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. §§ 12–26, 29 U.S.C. §§ 52–53). To give a sense of the Clayton Act's historical significance, Samuel Gompers—founder of the American Federation of Labor ("AFL")—described it as the "industrial magna charta" aimed to bring a "sledge hammer blow[]" to the wrongs and injustices so long inflicted upon the workers." FELIX FRANKFURTER & NATHAN GREENE, THE LABOR INJUNCTION 143 (1930) (quoting Gompers). President Woodrow Wilson boldly declared that with the passage of the Clayton Act, "[t]he working men of America have been given a veritable emancipation . . . by exempting labour organizations from processes of courts which treated their members like fractional parts of mobs . . . ." *Id.* at 143 n.36.

purposes of mutual help . . . ."[31] Section 20, in turn, limited the power of courts to issue injunctions "in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment."[32] Section 20 also prohibited injunctions against identified types of union activity, including strikes, boycotting, picketing, persuading others by peaceful means not to work, and peacefully assembling in a lawful manner and for lawful purposes.[33] The Clayton Act thus created the first so-called "labor exemption" to antitrust scrutiny.

The Supreme Court, however, narrowly interpreted the anti-injunction provisions in Section 20 of the Clayton Act in 1921, in *Duplex Printing Press Co. v. Deering*.[34] Specifically, the Court held that "[i]t would do violence to the guarded language employed"[35] to interpret Section 20 to protect workers other than those "in a proximate relation" to the dispute.[36]

---

[31] 15 U.S.C. § 17.

[32] 29 U.S.C. § 52.

[33] *Id.*

[34] 254 U.S. 443 (1921); s*ee also Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n*, 274 U.S. 37 (1927).

[35] *Duplex Printing Press Co.*, 254 U.S. at 472.

[36] *Id.* at 471.

Once again, Congress responded with the enactment of new legislation—the Norris-LaGuardia Act in 1932[37], and the NLRA in 1935.[38] Together, these statutes greatly strengthened the position of labor unions and marked the inception of our modern system of national labor relations. Most relevant here, the Norris-LaGuardia Act forbade courts from issuing injunctions in "a case involving or growing out of a labor dispute."[39] The NLRA codified a broad framework for the conduct and management of labor relations and delegated to the newly-created National Labor Relations Board (the "Board") responsibility for enforcing the provisions of the NLRA.[40] These laws substantially expanded labor's statutory exemption from antitrust scrutiny by closing the judicially-recognized gaps in the Clayton Act.

The federal courts once again assumed the task of mediating the friction between national antitrust and labor policies. In a duo of famous wartime cases—*Apex Hosiery Co. v. Leader* ("*Apex*")[41] and *United States v. Hutcheson*[42]—the Supreme Court substantially

---

[37] Pub. L. No. 72-65, ch. 90, 47 Stat. 70 (1932), (codified as amended at 15 U.S.C. §§ 101 *et seq.*–)

[38] Pub. L. No. 74-198, 49 Stat. 449 (1935) (codified as amended at 15 U.S.C. §§ 151 *et seq.*).

[39] Pub. L. No. 72-65, ch. 90, § 1, 47 Stat. 70 (codified at 29 U.S.C. § 101).

[40] 15 U.S.C. §§ 151 –69; Winter, *ante* note 3, at 29 (noting that the NLRA "is concerned entirely with regulating what it conceives to be a struggle for power between unions and employers.").

[41] 310 U.S. 469 (1940).

[42] 312 U.S. 219 (1941).

expanded the labor exemption to the antitrust laws. In *Apex*, the Supreme Court found that labor unions were still subject to the Sherman Act "to some extent not defined,"[43] but noted that the Sherman Act "was enacted in the era . . . of capital organized and directed to control of the market by suppression of competition," and that its purpose was to protect consumers from monopoly prices, not to regulate and police all kinds of interruptions to the flow of trade.[44] In *Hutcheson*, the Supreme Court declared that the Sherman, Clayton, and Norris-LaGuardia Acts must be jointly considered in arriving at a conclusion that labor union activities run afoul of antitrust laws, and that the narrow interpretation of the Clayton Act established in *Duplex Printing Press Co.* was inconsistent with congressional policy set out by these three "interlacing statutes."[45]

The Supreme Court, however, specified a qualification to the labor exemption in *Allen Bradley Co. v. Local Union No. 3, International Brotherhood. of Elec. Workers* ("*Allen Bradley*").[46] In *Allen Bradley*, the Court held that the union defendant forfeited its right to the labor exemption when it acted "in combination with business groups" in a

---

[43] *Apex*, 310 U.S. at 488.

[44] *Id.* at 492–93; *see also Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 806 (1945) ("*Allen Bradley")* (describing *Apex*).

[45] *Hutcheson*, 312 U.S. at 231–32, 236; *see also Allen Bradley*, 325 U.S. at 806 (describing *Hutcheson*).

[46] *Allen Bradley Co.*, 325 U.S. 797.

conspiracy to monopolize a product market.[47] The *Allen Bradley* Court noted "[i]t would be a surprising thing if Congress, in order to prevent a misapplication of [antitrust] legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective."[48]

Against this backdrop, and in the aftermath of World War II, the pendulum once again swung away from protecting labor towards promoting market competition. The Taft-Hartley Act of 1947, among other things, outlawed secondary boycotts and jurisdictional strikes.[49]  Twelve years later, the Landrum-Griffin Act of 1959[50] further reined-in what it perceived as labor misconduct. The Landrum-Griffin Act, which amended Section 8 of the NLRA, outlawed "hot cargo" agreements, which prohibit an employer from doing business with any firm not affiliated with the contracting union.[51] As noted above, though Congress prohibited "hot cargo" agreements, it exempted any such agreements made in the construction industry by means of the construction industry

---

[47] *Id.* at 809–10.

[48] *Id.*

[49] Pub. L. No. 80-101, 61 Stat. 136 (1947) (codified as amended at 29 U.S.C. §§ 141 *et seq.*). "Jurisdictional strikes" are strikes in order to compel the assignment of particular work to the employees represented by the union. BLACK'S LAW DICTIONARY 1463 (8th ed. 2004). A "secondary boycott" is used to protest the assignment of disputed work to members of another union or to unorganized workers. *Id.* at 199.

[50] Pub. L. No. 86-257, 73 Stat. 519 (codified at 29 U.S.C. §§ 401 *et seq.*).

proviso.[52]

The Supreme Court first interpreted the construction industry proviso in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100 ("Connell")*.[53] The Court held that Congress intended the construction industry proviso to apply only to agreements "in the context of collective-bargaining relationships and . . . possibly to common-situs relationships on particular jobsites as well."[54] *Connell* also required federal courts to read the construction industry proviso "in light of the statutory setting and the circumstances surrounding its enactment."[55] In other words, the construction industry proviso was intended to preserve the balance of power between construction employees and employers as it stood in 1959 — not to be a means by which labor unions expanded their influence into other work areas.[56]

In addition to defining the contours of the new statutory exemption created by the proviso, the *Connell* decision expressly

---

[51] *See* 29 U.S.C. § 158(e).

[52] *Id.*

[53] 421 U.S. 616 (1975).

[54] *Id.* at 633.

[55] *Id.* at 628.

[56] *Local 210*, 844 F.2d at 75–76 (holding the disputed practice must be consistent with "Congress' perceptions regarding the status quo in the construction industry [in 1959]."); *accord Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 657 (1982) ("Congress wished to preserve the *status quo* regarding agreements between unions and contractors in the construction industry." (internal quotation marks omitted)).

defined the so-called non-statutory exemption to antitrust laws. While the Clayton Act and the Norris-LaGuardia Act expressly state that labor unions themselves and certain union activities are exempt from antitrust laws, "concerted action or agreements between unions and nonlabor parties" are not protected by statute from antitrust scrutiny.[57] Accordingly, the Court recognized "that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a *limited nonstatutory exemption* from antitrust sanctions."[58] In *Connell*, the Court held that this limited non-statutory exemption *did not apply* to a union's agreement with a contractor where that agreement imposed "substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions."[59]

It bears noting that nowhere in the long history of antitrust exemptions for unions is there mention of jurisdictional disputes between unions, such as those presented by this appeal. Instead, the NLRA and its amendments were "concerned entirely with

---

[57] *Connell*, 421 U.S. at 622.

[58] *Id.* (emphasis added). Two other important Supreme Court cases had previously expounded on the non-statutory exemption: *United Mine Workers v. Pennington,* 381 U.S. 657 (1965), and *Local No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676 (1965). *Jewel Tea Co.* is discussed in greater detail below.

[59] *Connell*, 421 U.S. at 625.

regulating what it conceived to be a struggle for power between unions and employers."[60]

With this history in mind, we turn back to the parties' arguments and undertake to the ongoing task of balancing the competing interests between antitrust and labor considerations in the context of the restrictive CBA clauses at issue here.

## II. Sherman Act Claim

The Ironworkers allege that the disputed subcontracting practices constituted unreasonable restraints of trade, in violation of Section 1 of the Sherman Act,[61] and enforcement of those clauses was an attempt by the Carpenters to expand work in the relevant market area in violation of Section 2 of the Sherman Act.[62] The Carpenters, on the other hand, assert that the clauses and their enforcement are immunized from antitrust scrutiny because, in their view, they come within the protection of *both* the construction industry proviso and the non-statutory exemption.[63]

The District Court agreed with the Carpenters, and held that both apply here. We disagree. While the construction industry proviso applies to the disputed subcontracting practices, disputes of material fact prevent us from deciding, at this stage, whether the

---

[60] Winter, *ante* note 3, at 29.

[61] *See* 15 U.S.C. § 1.

[62] *See* 15 U.S.C. § 2.

[63] *Local 210*, 844 F.2d at 73.

non-statutory exemption applies.

## A.  The Construction Industry Proviso

To determine whether the Carpenters' affirmative defense to the Ironworkers' Sherman Act claim applies, the first question we must address is whether the disputed subcontracting practices fall within the protection of the construction industry proviso . As mentioned above, Section 8(e) of the NLRA contains a general prohibition on "hot cargo" agreements, stating

> [i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . .[64]

Section 8(e), however, also contains the construction industry proviso, which provides

> [t]hat nothing in this subsection shall apply to an agreement between a labor organization and an

---

[64] 29 U.S.C. § 158(e).

24

employer *in the construction industry* relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .[65]

The construction industry proviso thus plainly applies to agreements (1) between a labor organization and an employer; (2) relating to the contracting or subcontracting of work; (3) to be done at the site of construction.[66] In conducting this analysis, we bear in mind that Congress intended the construction industry proviso to apply only to agreements "in the context of a collective-bargaining relationship and . . . possibly to common-situs relationships on particular jobsites as well."[67] In addition, for the proviso to apply, the challenged practice must be consistent with "Congress'[s] perceptions regarding the status quo in the construction industry in 1959."[68]

The Ironworkers contend that (1) the parties were not "employers within the construction industry"; (2) the Carpenters' conduct did not occur within the context of a CBA; and (3) that the Carpenters' conduct is inconsistent with Congress's perception of practices in the construction industry in 1959. We disagree for substantially the reasons set forth in the District Court's opinion,

---

[65] *Id.* (emphasis added)

[66] *Id.*

[67] *Connell*, 421 U.S. at 633.

[68] *Local 210*, 844 F.2d at 75 (alterations omitted).

which we briefly recount here.

## 1. "Employers Within the Construction Industry"

First, we consider whether the parties with whom the Carpenters entered into CBAs, as well as the derivative "side agreements," were "employers within the construction industry" as used in Section 8(e). The Ironworkers make a strained argument that a general contractor who has subcontracted out all of its work did not qualify as an "employer in the construction industry." Specifically, they argue that, in some instances, a construction manager would award a subcontract to the Carpenters, even though there were no carpenters employed on the jobsite. This argument has little relevance for determining whether a party qualifies as an "employer within the construction industry" under the plain meaning of the statute. As the District Court properly held: "[a] plain reading of the statute indicates that the term 'employer in the construction industry' is just that, an employer in the construction industry—no more and no less."[69]

## 2. Conduct Occurred Within the Context of a CBA

Second, we turn to whether the Carpenters' conduct occurred within the context of a CBA.  The Ironworkers put forth two arguments explaining why the Carpenters' conduct did not. First, they argue in conclusory fashion that the subcontracting agreements were "side-agreements" and thus were not part of a valid CBA. We

---

[69] *Conn. Ironworkers Emp'rs Ass'n*, 157 F. Supp. 3d at 180.

disagree, and conclude that the District Court correctly held that the undisputed record demonstrates that each of the subcontracting agreements was part of a valid CBA.

Second, the Ironworkers assert that the CBAs did not apply to projects governed by project labor agreements ("PLAs") and thus, any attempt to enforce the clauses where the PLA governed was an attempt to enforce an agreement outside the scope of a collective bargaining relationship. Specifically, the Ironworkers point to PLA language that purportedly shows a conflict between it and the Carpenters' subcontracting agreements. Upon review of the record, we agree with the Carpenters that there was no actual conflict between the CBAs and PLAs. While the PLAs gave "full and exclusive authority for the management of its operations(s) . . . including the hiring . . . of its employees" to the non-Carpenter subcontractor, that provision was subordinate to the CBAs.[70] As the District Court explained, the PLAs were "expressly limited by other provisions of [the Collective Bargainning] Agreement[s], including a provision indicating that all Subcontractors recognize the Unions signator[ies] . . . as the sole and exclusive collective-bargaining representative of its craft hourly wage employees employed on the Project and the Local collective bargaining Agreement(s) will be adhered to."[71] Accordingly, we are not persuaded by the Ironworkers' theory that the PLAs replace rather than incorporate the CBAs.

---

[70] *Conn. Ironworkers Emp'rs Ass'n*, 157 F. Supp. 3d at 182.

[71] *Id.* (internal quotation marks and alterations omitted).

## 3. Conduct Consistent with Congress's Perceptions of the Construction Industry in 1959

Third, we assess whether the conduct at issue is consistent with Congress's perception of practices in the construction industry in 1959. The Ironworkers attempt to distinguish this appeal from our precedents upholding the validity of similar subcontracting clauses. They rest on the fact that the disputed clauses here are being enforced against contractors whose role in the construction industry did not exist in 1959. This argument misses the point. Even if the title "construction manager" did not exist in 1959, the concept of a construction industry manager engaged in subcontracting certainly did exist.

In sum, based on the undisputed record, we conclude that the Carpenters met their burden in showing that the construction industry proviso applies.

### B. The "Non-Statutory Exemption"

The second question in establishing the Carpenters' affirmative defense to the Ironworkers' Sherman Act claim is whether the non-statutory exemption applies to the subcontracting practices at issue in this case.

Our decision in *Local 210, Laborers' International Union of North America v. Labor Relations Division Associated General Contractors of America, N.Y.S. Chapter, Inc.* ("*Local* 210") sets forth the appropriate standard for determining whether the non-statutory exemption

applies.[72] This two-part standard "[i]n essence . . . balances the conflicting policies embodied in the labor and antitrust laws, with the policies inherent in labor law serving as the first point of reference."[73] Its requirements are as follows:

> First, the agreement at issue must further goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining. Second, the agreement must not impose a direct restraint on the business market [that] has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions that results from collective bargaining agreements.[74]

---

[72] 844 F.2d 69. The Ironworks argue for a five-pronged non-statutory exemption test that appears to be formulated from an amalgamation of various cases, drawing heavily from *Mackey v. National Football League,* 543 F.2d 606, 614 (8th Cir. 1976). *See* Pls.' Br. at 45. We have "never regarded the Eighth Circuit's test in *Mackey* as defining the appropriate limits of the non-statutory exemption," *Clarett v. National Football League*, 369 F.3d 124, 133 (2d Cir. 2004), and decline to do so here. We follow the *Local 210* precedent established in this Circuit.

[73] *Id.* at 79.

[74] *Id.* at 79–80 (citations, internal quotation marks, and alterations omitted).

Applying the Supreme Court's "classic formulation" of the non-statutory exemption set forth in the 1965 decision in *Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*,[75] we explained that

> agreements between a union and an employer are exempt from antitrust scrutiny if they are 'so intimately related to wages, hours and working conditions that the union's successful attempt to obtain the provisions through bona fide, arm's length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and therefore is exempt from the Sherman Act.'[76]

First, we consider the first prong of our test in *Local 210*—whether "the agreement at issue further[s] goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining."[77] The District Court relied on *Local 210* for the proposition that subcontracting clauses *are* within the scope of the mandatory subjects of collective bargaining. However, this reliance was misplaced.

Our holding in *Local 210* was premised on the fact that the particular subcontracting clauses in that dispute were designed to

---

[75] 381 U.S. at 679–80.

[76] *Local 210*, 844 F.2d at 79 (quoting *Jewel Tea Co.*, 381 U.S. at 689–90) (alterations omitted).

[77] *Local 210*, 844 F.2d at 79.

"*preserve* work traditionally performed by a union for a particular employer" and protect the "terms and conditions of employment" for union members.[78] In drawing this conclusion, the *Local 210* court relied on *Fibreboard Paper Prod. Corp. v. NLRB*, which held that "the 'contracting out' of the work *previously performed* by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representative of their employees to bargain collectively."[79]

*Local 210* and *Fibreboard* thus stand for the proposition that work *preservation*—not restrictive subcontracting generally—is a legitimate labor purpose and a mandatory subject of collective bargaining.[80] Restrictive subcontracting clauses are protected from

---

[78] *Id.* at 73 (emphasis added).

[79] 379 U.S. 203, 209 (1964) (emphasis added).

[80] Additional cases likewise suggest that work preservation is a "traditionally mandatory" subject of collective bargaining. *See, e.g., Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 630–31 (1967) ("[T]he boycott in the present cases was not used as a sword; it was a shield carried solely to preserve the members' jobs. We therefore have no occasion today to decide the question which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened by the boycotted product . . . [O]ur decision in *Fibreboard Paper Prods. Corp. . . .* implicitly recognizes the legitimacy of work preservation clauses. . . ."); *Soule Flass & Glazing Co. v. N.L.R.B.*, 652 F.2d 1055, 1088 (1st Cir. 1981) ("It is clear that '(t)he preservation or diversion of unit work' constitutes a 'term (or) condition of employment' subject to mandatory bargaining under § 8(d) of the Act."); *Consol. Exp., Inc. v. N.Y. Shipping Ass'n, Inc.*, 602 F.2d 494, 512 (3d Cir. 1979) ("[W]ork preservation is a mandatory subject of collective bargaining."); *N.L.R.B. v. Rockwell-Standard Corp., Transmission & Axle Div., Forge Div.*, 410 F.2d 953, 957 (6th Cir. 1969) ("The preservation or diversion of unit work is a subject of mandatory bargaining under the Act.").

application of the antitrust laws only to the extent that they work in service of work preservation or another legitimate labor goal. The District Court partially acknowledged this distinction, writing: "Even though the Court in *Fibreboard* declined to extend its holding to all types of subcontracting, it held that the 'substitution of one group of workers for another to perform the same task in the same [location] under the ultimate control of the same employer' is a mandatory subject of collective bargaining."[81] The District Court, however, did not independently assess whether the disputed subcontracting clauses were being used to preserve work that belonged to the Carpenters or to secure *new work* in the New England area that historically belonged to the Ironworkers.

We are unable to conclude whether the non-statutory exemption applies in this dispute without further fact-finding. As it stands, the record is insufficient to determine whether or not these subcontracting clauses were in fact being used to preserve work, prevent jobsite friction, improve the wages, enhance working conditions, or further another legitimate labor goal; or whether the clauses were used for work *expansion*—specifically whether the Carpenters used the subcontracting clauses to take over work that was traditionally done by the Ironworkers.

To the extent that these clauses were being primarily used to *expand* the Carpenters' work and take away work historically performed by the Ironworkers, such a purpose would not fall within

---

[81] *Conn. Ironworkers Emp'rs Ass'n*, 157 F. Supp. 3d at 184 (quoting *Fibreboard Paper Products Corp.*, 379 U.S. at 224 (Stewart, J., concurring)).

the scope of traditionally mandatory subjects of collective bargaining.[82]  As the history of the non-statutory exemption shows, it was never intended to be used as a weapon in turf battles. While "clauses protected by the construction industry proviso 'must be given breathing room to operate in their intended fashion without interference from the antitrust laws,'"[83] there remain questions of material fact as to whether these restrictions serve a legitimate labor goal.

In sum, our precedents have held that "preserv[ing] work traditionally performed by a union for a particular employer" relates to the "terms and conditions of employment" and is therefore a traditionally mandatory subject of collective bargaining.[84] By extension, we hold here that work expansion—as opposed to preservation—is *not* a traditionally mandatory subject of collective bargaining or legitimate goal for the purposes of determining whether the nonstatutory exemption shields particular conduct from antitrust scrutiny. Accordingly, we hold that the District Court erred in finding, as a matter of law, that the disputed subcontracting practices were entitled to the protection of the "non-statutory exemption" due to outstanding disputes of material fact.[85]

---

[82] *See Local 210*, 844 F.2d at 79.

[83] *Id.* at 80.

[84] *Id.* at 79.

[85] In light of this conclusion, we need not analyze the second prong of our test in *Local 210*—whether "the agreement . . .  impose[s] a direct restraint on the business market [that] has substantial anticompetitive effects, both actual and

## III. Unfair Labor Practices Claim

Plaintiff-Appellant MRS Enterprises, Inc. ("MRS") also argues that the District Court erred when it granted summary judgment to the Carpenters on its unfair labor practices claim under 29 U.S.C § 187 against the Carpenters.

MRS claims that the Carpenters used the disputed subcontracting clauses to encourage and induce signatory contractors to refrain from entering into contracts with MRS.[86] The Carpenters counter that these subcontracting practices are protected by the construction industry proviso in Section 8(e) of the NLRA.[87]

For the reasons stated above, we hold that the proviso applies to the Carpenters' subcontracting practices and are therefore immunized from an unfair labor practices claim.[88] Accordingly, the

---

potential, that would not follow naturally from the elimination of competition over wages and working conditions that results from collective bargaining agreements." *Id.* at 79. On remand, the District Court will need to reapply both prongs of our *Local 210* test in light of any evidence adduced by the parties.

In the absence of a district court ruling, we likewise decline to rule on the Carpenters' alternative argument that the antitrust claim against them fails to establish injury to competition or a dangerous probability of monopolization. On remand, the District Court may need to address these arguments as well.

[86] The Ironworkers also allege that construction managers often violate their CBAs by assigning covered work to non-Carpenters' signatory contractors. The record does not support this allegation so we do not consider it here.

[87] *See* Def. Br. at 24-25.

[88] *See Local 210*, 844 F. 2d 69, 73, 75-76 (2d Cir. 1988).

District Court appropriately held that there is no unfair labor violation as a matter of law.

## CONCLUSION

To summarize:

(1) the District Court correctly held that the construction industry proviso under Section 8(e) of the NLRA protects the Carpenters' subcontracting practices; but,

(2) the District Court erred in holding that the non-statutory exemption applies in the instant case. Absent additional findings by the District Court as to whether these subcontracting practices further a legitimate aims of collective bargaining or are impermissibly being used for work expansion, we are unable to hold that the non-statutory exemption applies to the Carpenters' subcontracting practices.

Accordingly, we **VACATE** the judgment of the District Court as to the Sherman Act claim, **AFFIRM** the judgment as to the unfair labor practices claim, and **REMAND** the cause to the District Court for further proceedings consistent with this opinion, including for such additional discovery as will permit the District Court to be informed of the relevant history and permit the parties to move for summary judgment or, if necessary, to proceed to trial.